442 A.2d 731

**Bertha E. REIMER, Appellant,**

v.

**James K. DELISIO, Jr.**

Superior Court of Pennsylvania.

Argued March 4, 1980.

Filed Feb. 19, 1982.

Petition for Allowance of Appeal Granted May 27, 1982.

---

206

David S. Shrager, Philadelphia, for appellant.

Donald H. Yost, York, for appellee.

Before CERCONE, President Judge, and WATKINS and MONTGOMERY, JJ.

CERCONE, President Judge:

The instant appeal arises from a jury verdict in the amount of $23,230 in favor of plaintiff appellant, Bertha Reimer, for personal injuries she sustained in an automobile accident. For reasons which she attributes to the trial judge's rulings, Mrs. Reimer contends the jury's verdict was inadequate. In particular Mrs. Reimer contends the trial court erred in withholding the question of punitive damages from the jury's consideration, and erred in refusing to permit the jury to view a motion picture of her daily activities as hampered by her injuries. She further contends the court abused its discretion in excluding certain evidence of the need for future surgery and her future economic loss, as well as reacting improperly and prejudicially to her attempts to fortify her case when the court ruled on defendants' objections. The relevant facts are as follows:

On July 22, 1977 the automobile defendant-appellee, James Delisio was operating collided with Mrs. Reimer's automobile, when the Delisio vehicle crossed the center line while travelling in excess of fifty miles per hour on a public street adjacent to a playground. At the time of the accident Mrs. Reimer, a widow, was in reasonably good health and was employed at a clothing factory fulltime. The damage from the force of the collision pinned Mrs. Reimer in her automobile, smashed both her knees, and caused her sundry other injuries. As a consequence her left knee cap was surgically removed as was part of her right knee cap. In addition she suffered an immobilized left shoulder, bursitis of the hip, and permanent scarring.

Mrs. Reimer's rehabilitation therapy was lengthy, undoubtedly painful, and will never be wholly restorative. While she previously had worked forty-hour weeks with frequent overtime, she now is able to work no more than five hours a day, and her condition is only likely to worsen. Her leisure time and homemaking activities are similarly restricted.

## Punitive Damages

Laying aside for the moment appellant's contentions concerning allegedly restrictive rulings on evidence she wished to introduce to substantiate her compensatory damages, we turn to appellant's claim that the trial court erred in refusing to permit the jury to consider punitive damages based upon the arguably reckless conduct of Mr. Delisio. In so doing the court determined that punitive damages for reckless or willful conduct were not recoverable pursuant to Pennsylvania's No-Fault Motor Vehicle Insurance Act, 40 P.S. § 1009.101 et seq. (Supp.1981). With this conclusion, we reluctantly agree.

From the outset it should be kept in mind that the sine qua non for adoption of the No-Fault Act was the legislature's determination that the traditional tort system for determining liability and compensating victims of motor vehicle accidents was a failure. The widespread use of Motor Vehicle liability insurance had undercut the deterrent effect which requiring a negligent party to compensate the victim of his negligence was supposed to have. On the other hand, the existence of potential liability for such negligence, and the litigation entailed, begat lengthy delays in compensating victims for their economic losses at a time when, due to their incapacitation, they were least able to afford such delays. Interwoven in the fabric of the fault system, of course, were the threads of punitive liability for conduct more egregious than negligence—gross negligence, recklessness, and willful disregard for the safety of others. We agree with appellant's argument that the fault system for compensating victims could have been abolished without eliminating entirely its punitive aspects. Indeed, that may have been preferable. However, we disagree with appellant that punitive liability for gross negligence or recklessness could only be abolished by use of language specifically referring to punitive damages rather than, as was done, by use of a clause abolishing all tort liability for accidents involving motor vehicles.

210

■ We are persuaded that the initial clause of Section 1009.301 of our No-Fault Act explicitly abolished all causes of action falling within the ambit of the Act; and, consequently abolished punitive damages for gross negligence, reckless disregard, and the like. Subsection (a) of that Section provides:

*Partial Abolition.*—Tort liability is abolished with respect to any injury that takes place in this State in accordance with the provisions of this act if such injury arises out of the maintenance and use of a motor vehicle, except that. . . .

There follow exceptions which do not specifically refer to liability for gross negligence, although intentional conduct is so excepted.[1]

We are not persuaded, either, that punitive damages for recklessness or gross negligence are implicitly preserved in subsections (a)(4) or (a)(5) of Section 301 of the Act. Subsection (a)(4) provides:

A person remains liable for *loss* which is not compensated because of any limitation in accordance with section 202(a), (b), (c) or (d) of this act. . . ." [Emphasis added.]

"Loss" is defined in the Act as "accrued economic detriment . . . consisting of, *and limited to*, allowable expense, work loss, replacement services loss, and survivor's loss." Section 103. Those types of expenses and losses are also defined in Section 103 of the Act and cannot rationally be interpreted as including punitive damages. Since "loss" is defined in the Act in a way which excludes punitive damages, it cannot be said that such damages are includable as "loss which is not compensated because of any limitation in accordance with Section 202(a), (b), (c) or (d) of his act. . . ." Consequently, under Section 301(a)(4) a person does not remain liable for punitive damages for reckless or gross negligence.

1. This Court recently rejected the argument that "intentionally injuring" someone included injury arising from gross negligence. See *Teagle v. Hart*, 279 Pa.Superior Ct. 487, 421 A.2d 304 (1980). See also U.S. Senate Report No. 94–283, Calendar No. 276 (July 15, 1975) at p. 87.

The next subsection, 301(a)(5), is equally clear in not preserving punitive liability for recklessness or gross negligence. Section 301(a)(5) provides that a "person remains liable for damage for non-economic detriment" on the conditions there following. However, Section 103 of the Act specifically defines non-economic detriment to exclude "punitive or exemplary damages." Consequently, according to this language, a person does not remain liable for punitive damages under the provisions of subsection (a)(5) of Section 301. See D. Shrager, *The Pennsylvania No-Fault Motor Vehicle Act* § 2.7 (1979).

Appellant valiantly raises the argument that Section 301(b) has preserved the right of a victim to recover punitive damages for reckless or grossly negligent conduct. Section 301(b) provides:

*Nonreimbursable tort fine.*—Nothing in this section shall be construed to immunize an individual from liability to pay a fine on the basis of fault in any proceeding based upon any act or omission arising out of the maintenance or use of a motor vehicle: Provided, That such fine may not be paid or reimbursed by an insurer or other restoration obligor.

There is little doubt that, on its face, this provision admits of no ready interpretation, especially since the term "tort fine" appears to have been coined. In that regard we emphathize with the trial judge when he stated he did not know what a tort fine was. On the other hand there is nothing promiscuous about appellant's contention that the term "tort fine" includes punitive or exemplary damages. Punitive damages are, in a manner of speaking, a penalty or fine imposed upon a person for engaging in particularly egregious conduct, payable to the victim as a kind of windfall, at least in the sense that the punitive damages are paid in addition to damages necessary to make the victim whole. See C. McCormick, *Damages* § 77 (1935); D. Dobbs, *Remedies* § 3.9 (1973); Restatement of Torts, 2d § 908, Comment a. However, the terms punitive damages or exemplary damages are so commonly understood that it is unlikely the

212

legislature would invent a new term to use in Section 301(b) if it sought to preserve punitive damages for recklessness or gross negligence. In fact, our research has revealed no such legislative purpose.

It is well known that our General Assembly borrowed generously from the National No-Fault Motor Vehicle Insurance Act. See D. Shrager, *The Pennsylvania Motor Vehicle Insurance Act,* § 2.7 (1977). Indeed, in Section 102(a)(5) the General Assembly states that it relied on the exhaustive federal studies concerning the desirability of enacting a national no-fault act. It is from the various drafts of such proposed federal legislation that our Section 301(b) was taken, and it is in the congressional study committees' reports that the meaning of "tort fine" is discussed. Furthermore, the committee reports shed much light on the question of whether the no-fault act was drafted with the intention of eliminating punitive damages in actions arising under the Act. The National No-Fault Motor Vehicle Act, Report of the Senate Committee on Commerce, No. 93–382, Calendar No. 358 (August 15, 1973) at pp. 73–74 describes the purpose and meaning of the term "tort fine":

The development of liability insurance, to offset the fact that a tort system is a most inadequate mechanism for compensation, served to vitiate the deterrent function of tort law as applied to the enforcement of safe driving requirements. A large tort judgment may be entered against a drunken or reckless driver, but to the extent that judgment is paid by his insurance company, the driver himself is neither punished nor deterred from similar conduct in the future. *The tort judgment does not today operate to suspend or revoke the driver's license of a defendant who is found negligent nor does it require him to pay any fine to the State, nor does it authorize the court to impound his motor vehicle for a fixed period of time so that he will be physically unable to drive that automobile, nor does it in any other way enforce the traffic laws of the State, punish the negligent violator, or serve by example to deter others from similar conduct.*

The tragic annual death toll on the Nation's highways bears mute testimony to the need to get negligent drivers off the highways, but the negligence-liability insurance system has failed completely to meet that objective.

Subsection (b) of section 303 (and the corresponding national standard—section 206(b)) make clear that it is not the intent of the Committee on Commerce to interfere with the original jurisdiction of an "action on the case" (tort lawsuit). *Any State or political subdivision of a State acting in accordance with State law may maintain a motor vehicle liability system based on fault so long as no insurer or other restoration obligor is permitted to pay the "fine" imposed in any such proceeding. The term "fine" does not mean solely a criminal penalty imposed upon conviction of a crime, but rather it includes any charge, levy, assessment, order, condition, or requirement that may be imposed "in any proceeding" (e.g. criminal, civil, administrative, or arbitration) "on the basis of fault ... based upon any act or omission arising out of the maintenance or use of a motor vehicle".* S. 354 provides this option even though there is a respectable body of opinion suggesting that there is no great promise for a deterrence effect even when liability is not insurable. *The term "fine" does not include a device in present law which has, at least in some States, a similar purpose—punitive damages. No award of punitive damages may be entered under S. 354, even in cases in which tort-lawsuit liability is preserved. The reason for this exclusion is in part because under some case-law decisions awards for punitive damages may be paid by liability insurance, a practice which vitiates the purpose of a punitive-damages judgment.*

S. 354 does not create a nonreimbursable tort fine system at the Federal level, nor does it make it a national standard for a State to establish such a system. This area is one in which State experimentation and experience is needed before even contemplating making an uninsurable-tort-fine system as a Federal highway-safety program or

a national standard. Among the many questions that should be addressed: Would bad drivers in fact be deterred or would such a system work to get the drunk, the reckless, and the anti-social driver off the highway? Should the fine be paid to the citizen who files a request for a tort-fine proceeding? Should it be divided between such citizen and the unit of local or State government that brings the action, or should it go entirely to the government? Should tort-fine proceeds collected by the State be earmarked exclusively for traffic-safety programs? Should the authorized fine include vehicle impoundment, suspension of license for a period, or revocation of license?

This position was subsequently reiterated in the National Standards for No-Fault Insurance Act, Report from the Senate Committee on Commerce, No. 94–283, Calendar No. 276 (July 15, 1975) at pp. 90–91 wherein Senator Magnuson, on behalf of the Commerce Committee reports:

Subsection (b) (and the corresponding national standard—section 206(b)) provides that any State or political subdivision may continue to maintain a motor vehicle liability system based on fault so long as no insurer or other restoration obligor is permitted to pay the "fine" imposed in any such proceeding. (The term "fine" does not mean a criminal penalty imposed upon conviction of a crime, but rather it includes any charge, levy, assessment, order, condition, or requirement that may be imposed "in any proceeding" (e.g. criminal, civil, administrative, or arbitration) "on the basis of fault . . . based upon any act or omission arising out of the maintenance or use of a motor vehicle". (*Except that it does not include punitive damages.*)

Historically, the tort action based on fault had the same purpose as the criminal prosecution: enforcement of community standards, punishment of those who violate such standards, and deterrence of those who might violate such standards but for the enforcement and punishment. The development of liability insurance (to offset the fact that a tort system is a most inadequate mechanism for compen-

sation) vitiated the deterrent function of tort law as applied to the enforcement of safe driving requirements. A large tort judgment may be entered against a drunken or reckless driver, but, to the extent that judgment is paid by his insurance company, the driver himself is neither punished nor deterred from similar conduct in the future. The tort judgment does not today operate to suspend or revoke the driver's license of a defendant who is found negligent nor does it require him to pay any fine to the State, nor does it authorize the court to impound his motor vehicle for a fixed period of time so that he will be physically unable to drive that automobile, nor does it in any other way enforce the traffic laws of the State, punish the negligent violator, or serve by example to deter others from similar conduct. *The tragic annual death toll on the Nation's highways bears mute testimony to the need to get negligent drivers off the highways, but the negligence-liability insurance system has failed completely to meet that objective. A tort-fine system might succeed in accomplishing this goal.*

Two points emerge rather clearly from these reports: First, rather than encompassing punitive damages, "tort fine" was intended to be distinguished from punitive damages. Second, S. 354 was intended to exclude punitive damages for any cause of action arising within the four corners of the bill. Consequently, our research reveals not only that appellant's interpretation of the term "tort fine" must be rejected, it also fortifies our conclusion that Section 301(a)(4) & (5) were not intended to include punitive damages upon proof that the defendant had been reckless or grossly negligent in injuring the victim. As more than one commentator on the subject of no-fault insurance legislation has written:

The whole thrust of the evolution of automobile insurance, the emergence of financial responsibility laws, and the clamor for no-fault systems, has been to focus on the plight of the insured party in the automobile accident. Punishment of the guilty driver is a secondary consideration and a minor one at that. W. Rokes, *No-Fault Insur-*

*ance* 213 (1971). See also M. Woodroof et al., *Automobile Insurance & No-Fault Law* §§ 1:34–35 & 39 (1974).

■ Appellant's final contention on the subject of punitive damages is that, if our no-fault act did indeed abolish punitive damages for reckless or grossly negligent conduct, to that extent the act violates Article III, Section 18 of the Pennsylvania Constitution.[2] We find that our Supreme Court's discussion in *Singer v. Sheppard*, 464 Pa. 387, 397, 346 A.2d 897 (1975), coupled with the discussion hereinabove set forth, clearly disposes of this constitutional challenge.

Article III, Section 18 of our Constitution provides in pertinent part that, worker's compensation laws excepted, "in no other cases shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property. . . ." There are two themes of interpretation of this provision which militate against appellant's position. First, as the Court stated in *Thirteenth & Fifteenth St. Passenger Ry. v. Boudrou*, 92 Pa. 475, 482 (1880):

> Nothing less than the full amount of pecuniary damages which a man suffers from an injury . . . fills the measure secured to him in the Declaration of Rights. . . . A limitation of recovery to a sum less than actual damage, is palpably in conflict with the right to remedy by due course of law.

As has been discussed above, punitive damages are not "pecuniary damages . . . a man suffers from an injury. . . ." To eliminate punitive damages as incident to a particular cause of action is not to limit "recovery to a sum less than actual damages. . . ." The No-Fault Act does not limit appellant's right to be made whole or fully compensated for

2. Appellant also argues that the act violates the equal protection clause of the federal constitution because it establishes two classifications of tort victims: those under the no-fault act who may not recover punitive damages, and those victims of other torts who may, in a proper case, recover punitive damages. We think the General Assembly's findings and purposes set forth in Section 102 of the Act and the foregoing discussion adequately demonstrate that such classifications are not arbitrary, capricious or unreasonable.

the injuries she sustained as a consequence of appellee's negligence.

Second, Article III, Section 18, has consistently been construed as permitting the General Assembly to eliminate causes of action despite the fact that their elimination necessarily has the effect of eliminating "the amount to be recovered" therefor. See, e.g., *Singer v. Sheppard*, 464 Pa. at 396, 346 A.2d at 902 and the cases cited therein. See also *Freezer Storage, Inc. v. Armstrong Cork Co.*, 476 Pa. 270, 382 A.2d 715 (1978). Our No-Fault Act did not simply eliminate punitive damages; indeed, the right to recover punitive damages is arguably preserved for intentionally tortious conduct under Section 301(a)(3). See note 1, supra. The Act eliminated as well the cause of action for gross negligence, leaving the "tort fine" concept to treat with such egregious conduct if, and when, the General Assembly deems it appropriate to enact such a system. By eliminating the cause of action for gross negligence as well as the remedy of punitive damages, the General Assembly did not run afoul the injunction of Article III, Section 18.

In sum, we have analyzed and must reject appellant's resourceful arguments concerning her claim to punitive damages under our No-Fault Act. Consequently, we find no error in the trial court's refusal to charge the jury on punitive damages.

### Evidentiary Rulings

Appellant contends that prior to and during the trial the court made several erroneous and, from appellant's perspective, restrictive evidentiary rulings, the natural effect of which was a lower verdict on damages. In this regard we agree with appellant and will reverse and remand for a new trial.

First, appellant contends that the trial court erred in barring admission of a certain motion picture showing, among other things, therapeutic exercises appellant undertook in recuperating from her leg injuries and the difficulty she had in walking during her recovery period. The special

problem we have with the court's ruling is that the court ruled without first having viewed the film. This, we find, was error.

 The law in Pennsylvania is clear that the recovery of a party from injuries may be proved by motion pictures taken by persons whose interests are adverse to those of the party. See *Mertz v. Mellon Nat'l Bank & Trust Co.*, 11 Pa.Cmwlth. 541, 314 A.2d 570 (1974); *Kelly Co., Inc. v. Workmen's Comp. Bd. of App.*, 8 Pa.Cmwlth. 589, 303 A.2d 255 (1973); *De Battiste v. Anthony Laudadio & Sons*, 167 Pa. Superior Ct. 38, 74 A.2d 784 (1950). Cf. *Commonwealth v. Roller*, 100 Pa. Superior Ct. 125 (1930). The trial court and appellee recognize this to be the law. However, appellee argued, and the trial court agreed, that motion pictures filmed at appellant's behest for the express purpose of being used at trial stand on a different footing—the possibility that such films were staged, are undeniably self-serving, and might be given undue weight by the jury, coalesce to render them inadmissible. Finding no authority for the proposition that such films are inadmissible per se, we must disagree. On the contrary, the weight of authority holds such films admissible, if relevant, and provided the proper safeguards of identification and authentication are met.

"Ordinarily, photographs, sound recordings, and motion pictures are, if properly authenticated, admissible in evidence for the purpose of establishing pertinent facts." 14 P.L.E., Evidence § 223 (1959).

While the cases cited above are factually distinguishable from the instant case in that the films were taken without the knowledge or consent of the injured party by a party adverse in interest, the cases do not imply, much less explicitly state, that motion pictures filmed under the circumstances present in the instant case contravene the general rule of admissibility. For example, in *Kelly, Co., Inc.*, 8 Pa.Cmwlth. at 593, 303 A.2d at 257, the court stated unequivocally: "Motion pictures which are properly identified and authenticated are admissible as evidence for the purpose of establishing facts." There is no implication that such

films must be taken by an adverse party to establish their admissibility.

Furthermore, there is a substantial body of case law from other jurisdictions holding that the plaintiff in a personal injury action may offer motion pictures to demonstrate the pain and suffering the injury entailed. See 5 Am.Jur., *Trials* 979–981 (1966); *Annotation*, 62 A.L.R.2d 686; *Annotation*, 9 A.L.R.2d 921. As is stated in 8 Am.Jur., *Proof of Facts* 153, 155 (1960).

"It is true that the camera does not record on film the same picture that the eye transmits to the brain, but it is also true that less distortion is likely to inhere in a photographic representation of a scene than in a verbal one. In this respect the motion picture had advantages over the still photograph, for it may travel, like the eye, over a scene."

Of course, the possibility of fabrication, misrepresentation, or distortion exists with respect to motion pictures filmed by the party seeking to use them at trial; whether to a lesser degree or not, however, the same possibility exists with respect to films taken by an adverse party. See *Kelly Co., Inc.*, 8 Pa.Cmwlth. at 593, 303 A.2d at 257. Indeed, the possibility of misrepresentation exists with still photographs, as well as with the testimony of an interested witness; and, we are not persuaded that the possibility is so great in the case of motion pictures that they should be excluded as a matter of law. Rather, when necessary, more stringent rules of authentication, such as requiring a medical expert to testify prior to the jury's viewing the film that the film is a fair and accurate depiction of the scene and events it shows, coupled with liberal cross-examination, offer satisfactory assurances of verity in light of the advantages of this means of proof. See 8 Am.Jur., *Proof of Facts* 154 (1960). Questions of the adequacy of the authentication of the motion picture could likewise have been resolved *in Camera* by listening to the proposed testimony of the authenticating witnesses and previewing the film. Assuming adequate authentication, the only remaining question would be wheth-

er the film is inflammatory or an appeal to the passion and prejudices of the jury. See *Fahringer v. Rinehimer*, 283 Pa. Superior Ct. 93, 423 A.2d 731 (1980); *Piso v. Weirton Steel Co.*, 235 Pa. Superior Ct. 517, 345 A.2d 728 (1975). In the instant case, appellant intended to show the films in conjunction with, and authenticated by, the testimony of appellant's treating physician. Under these circumstances, the court's exclusion of the film without viewing it was error.

Ordinarily at this juncture this case might be remanded with instructions to the trial court to consider the above-mentioned prerequisites of admissibility with respect to the motion picture of appellant's recuperation. If the court were to conclude the film and concomitant testimony satisfied these prerequisites it would grant appellant a new trial. Although this inquiry presumably will remain necessary on remand, we have concluded that appellant is entitled to an immediate grant of a new trial on another ground.

■ During appellant's case-in-chief on damages, her orthopedic surgeon testified that there was a ten per cent possibility that appellant would require surgery on her right knee in the future. Upon appellee's objection the trial court struck the testimony on the ground that it was too speculative for the jury's consideration in quantifying pain and suffering. In its opinion following appellant's post-trial motions, the trial court virtually conceded this ruling to be error. *Walsh v. Brody*, 220 Pa. Superior Ct. 293, 286 A.2d 666 (1971). See also, *Boyle v. Pennsylvania R.R. Co.*, 403 Pa. 614, 170 A.2d 865 (1961). In denying appellant's motion for a new trial, the court reasoned that other evidence of the doctor's prognosis for appellant's recovery, coupled with the verdict in appellant's favor, rendered this ruling merely an "error in the abstract" insufficient to entitle appellant to a new trial. See *Rankin v. McCurry*, 402 Pa. 494, 166 A.2d 536 (1961). While there is no questioning the verity of the principle announced in *Rankin v. McCurry*, the case sets forth no facts or issues sufficient for the reader to determine the context in which the principle was applied. Other cases make it clear that the instant case is distinguishable from those in which *Rankin v. McCurry* has been applied.

In *Warren v. Mosites*, 253 Pa. Superior Ct. 395, 385 A.2d 397 (1978), the driver of an automobile in which her mother, the owner, was a passenger and co-plaintiff complained on appeal that she was entitled to a new trial because of the trial court's admission of certain hearsay tending to exculpate the defendant from liability. This Court agreed the testimony was hearsay; the difficulty was that the jury had awarded the mother, who suffered no personal injuries, a full recovery against the defendant for the damage to her automobile while awarding the daughter no damages for personal injuries. From the verdict it was obvious the jury had found the defendant negligent despite the hearsay, but found the driver contributorily negligent with respect to her operation of the vehicle. Thus, the error in admitting the hearsay, which had no bearing on contributory negligence and had not affected the award for the vehicle's owner, was error in the abstract.

Another example of the application of this principle can be found in *Granowitz v. Redevelopment Authority*, 432 Pa. 243, 247 A.2d 623 (1968) and *Gallo v. Redevelopment Authority*, 19 Pa.Cmwlth. 71, 339 A.2d 165 (1975). In both cases a condemnee appealed an award claiming that the court had excluded certain evidence probative of the fair market value of the condemned property. In neither case, however, did the condemnee claim that the award entered was inadequate. Obviously, if the award were not inadequate any erroneously excluded evidence of fair market value constituted error in the abstract.

Returning to the facts of this case, it simply cannot be said that excluding testimony of the potential need for a discrete surgical procedure was error in the abstract. Based on the trial court's ruling the jury could not award any damages for potential pain and suffering attendant to that surgery. Additionally, while the verdict rendered in this case is not so low as to shock the conscience, the evidence of lost wages and pain and suffering introduced at trial certainly would have supported a much higher verdict. As our Supreme Court stated in *Lambert v. Durallium Prod. Corp.*,

364 Pa. 284, 72 A.2d 66 (1950): "Exclusion of proper evidence which might have affected the verdict requires a new trial." Unlike *Eldridge v. Melcher*, 226 Pa. Superior Ct. 381, 313 A.2d 750 (1973), the excluded evidence in this case was not cumulative and was likely to affect the verdict.

Consequently, the order denying appellant's motion for a new trial is reversed, the judgment vacated, and the case is remanded for a new trial.

WATKINS, J., concurs in the result.