526 A.2d 383

COMMONWEALTH of Pennsylvania

v.

Newton STARK, Appellant.

Superior Court of Pennsylvania.

Argued February 20, 1987.

Filed May 20, 1987.

358

James D. Casale, Williamsport, for appellant.

Kenneth A. Osokow, Assistant District Attorney, Williamsport, for Com., appellee.

Before WIEAND, OLSZEWSKI and TAMILIA, JJ.

WIEAND, Judge:

On September 13, 1985, after trial by jury, Newton Stark was found guilty of first degree murder. The conviction arose from an incident in which Stark had gone to the apartment of Larry Hoover, who was dating Stark's estranged wife, and shot him in the chest with a shotgun. Stark filed timely post-trial motions in which he alleged numerous instances of trial error. Post-trial relief was denied on December 18, 1985, however, and Stark was sentenced to a term of life imprisonment. In this direct appeal from the judgment of sentence, Stark contends that the evidence was insufficient to support the verdict and that the trial court committed numerous trial errors. We will discuss seriatim the more significant of these issues.[1]

---

1. Stark also contends that the trial court erred by (1) denying his pre-trial motion for a change of venue; (2) permitting a state police trooper to testify at trial about incriminating statements made by Stark which had not been considered at the suppression hearing; (3) receiving into evidence various pictures of the victim and the scene of

"In reviewing the sufficiency of the evidence, we view the evidence presented and all reasonable inferences therefrom in the light most favorable to the Commonwealth as verdict winner. The test is whether the evidence, thus viewed, is sufficient to prove guilt beyond a reasonable doubt." *Commonwealth v. Campbell*, 353 Pa.Super. 178, 181. 509 A.2d 394, 395 (1986). See: *Commonwealth v. Madison*, 501 Pa. 485, 490, 462 A.2d 228, 231 (1983); *Commonwealth v. Mease*, 357 Pa.Super. 366, 368–71, 516 A.2d 24, 25–26 (1986); *Commonwealth v. Taylor*, 324 Pa.Super. 420, 424, 471 A.2d 1228, 1229 (1984).

The evidence in this case showed that Stark and Larry Hoover had been close friends. Their friendship came to an end in October, 1984, when Stark's wife left the marital home and began dating Hoover. In February, 1985, relations between Stark and Hoover became further strained when Stark learned that Hoover had disciplined one of Stark's young daughters. Shortly thereafter, Stark began making threats, in the presence of co-workers, that he would kill Hoover if Hoover did not stay away from Stark's children. On two occasions Stark spoke with Harold Bower, another co-worker, about Hoover and said: "I can't beat him up, he's too big. I'm going to have to use a gun on him."

At or about the same time, Stark and his wife began discussing the possibility of reconciliation. On the morning prior to the shooting, however, his wife told Stark that she had changed her mind and that there would be no reconciliation. That evening, as Stark was leaving work, he told Harold Bower that he (Bower) could have Stark's job because he (Stark) would not be returning to work. When asked "why", Stark replied: "Tonight's the night that [I'm]

the crime; (4) permitting the Commonwealth to show the jury slides of these photographs; (5) permitting the jury to read the transcripts of Stark's audio and videotaped confessions while the recordings were being played at trial; and (6) permitting a state trooper to testify in rebuttal that the scope of Stark's rifle could be used at night. These arguments were correctly resolved and adequately discussed in the trial court's opinion, and we perceive nothing to be gained by writing further thereon.

going to do it." A few minutes later, Stark found a letter from his wife inside his car in which she had written that there would be no reconciliation and that she did not wish to see or hear from him again. Stark went to a local bar with a friend where he consumed five or six mugs of beer and a shot of Apple Schnapps. At approximately 10:30 p.m., Stark went to another bar, known as the 227 Bar, where he consumed a bottle of beer. At 11:45 p.m., as Stark was leaving the bar, he stated to Gary Lomison: "Well, I think I'm going to go and kill someone tonight." At approximately 1:00 a.m., Stark fatally shot Hoover at Hoover's apartment.

Shortly after 2:00 a.m., Trooper Chester M. Lampman arrived at the scene of the shooting. An hour later, he began to interrogate Stark about the killing. During this interrogation, Stark told Lampman of Hoover's involvement with Stark's wife and children and admitted having made numerous threats to kill him. Stark also recounted the events preceding the shooting. He stated that after he had left the 227 Bar he had driven to his and Hoover's place of employment and had checked the work schedule to see what time Hoover would be reporting to work that morning. He then drove to his trailer home and retrieved a twelve gauge shotgun and a seven millimeter scoped rifle. The reason he retrieved both guns, he explained, was because he was unsure about whether he would kill Hoover in Hoover's apartment, using the shotgun, or in the parking lot of Hoover's place of employment, using the scoped rifle. When he arrived at Hoover's apartment building, he decided to use the shotgun. He quietly climbed the stairs to Hoover's apartment, so as not to "tip anyone off," and knocked on the door. When Stark identified himself, Hoover opened the door. Hoover was then holding a revolver in his hand. According to Stark's statement, Hoover pointed the gun at Stark's groin and said: "Do you know where this gun is pointed?" Stark replied: "Yes, I guess this is it." He then shot Hoover in the chest. Stark stated that after he shot Hoover, he entered the apartment, sat down at the kitchen table and listened to Hoover moan and breathe.

A short time after the initial interrogation of Stark, Trooper Lampman questioned Stark again and asked whether Hoover had fired his gun. Stark responded that he did not think so and added: "What's this all about? Big deal, I shot a guy. Shotgun's on the table. Used to be my best friend. I was there. He had a pistol. I can't say it's self defense because I went gunning for him. See how my gun is pointed?" Trooper Lampman testified that when Stark made these statements, he did not appear to be intoxicated. Rather, he responded well to questions, did not smell of alcohol, had no difficulty walking, even with handcuffs on, and appeared to be in physical control of himself.

During trial both a tape recorded interview and a video-taped interview with Stark were played for the jury. In these interviews, Stark confirmed his prior statements to Trooper Lampman. In his trial testimony, however, he contradicted portions of the prior statements.

At trial, Stark explained that although he had made numerous threats to kill Hoover, he had not actually intended to kill him. Rather, he said, he had made the threats in the hope that Hoover would hear of them and would leave Stark's children alone. Stark also admitted to having told Gary Lomison on the night of the shooting that he was going to kill someone. He testified, however, that he had not meant it. He also denied that he had gone to Hoover's apartment for the purpose of killing him. He stated, rather, that he had gone there only because he had believed that his wife and children were there and because he had wanted to see his children. Stark further stated that he had taken a gun with him only as insurance that Hoover would not be able to prevent him from seeing his children. According to Stark's testimony, after he saw Hoover point the revolver at him, he believed that Hoover was going to shoot him. Therefore, he tried to move quickly to one side to avoid being shot; and, as he did so, the shotgun discharged.

■ Stark argues that the evidence was insufficient to support the jury's verdict of guilty of murder in the first degree because neither malice nor a specific intent to kill

was proven. We disagree. The testimony of the Commonwealth's witnesses and the recorded confessions of Stark reveal that Stark went to Hoover's apartment for the express purpose of killing him. The evidence also showed, Stark's version to the contrary notwithstanding, that he had not fired his weapon in self-defense. Stark had told others that he was going to kill Hoover on the night in question and told Trooper Lampman after the killing that he had not fired his gun in self-defense. In view of the Commonwealth's evidence, the jury could understandably reject as not credible the testimonial explanation offered by Stark at trial. Indeed, given Stark's earlier admissions, it is difficult to perceive how the jury could in good conscience have done otherwise.

■ The evidence was not such as to require the jury to find that Stark was too intoxicated to form a specific intent to kill. " 'Evidence of intoxication, if believed, may operate to negate the intent necessary for conviction of murder in the first degree. [18 Pa.C.S. § 308]' " *Commonwealth v. Stantz,* 353 Pa.Super. 95, 106, 509 A.2d 351, 357 (1986), quoting *Commonwealth v. Fairell,* 476 Pa. 128, 133–134, 381 A.2d 1258, 1260 (1977). "However, drinking and intoxication are not synonymous terms. A defendant must be overwhelmed or overpowered by alcohol to the point of losing his or her faculties so as to be incapable of forming a specific intent to kill before an act of murder will be reduced to murder in the third degree." *Commonwealth v. Price,* 306 Pa.Super. 507, 512, 452 A.2d 840, 842 (1982). See: *Commonwealth v. Reiff,* 489 Pa. 12, 413 A.2d 672 (1980); *Commonwealth v. Fairell, supra; Commonwealth v. Rose,* 463 Pa. 264, 344 A.2d 824 (1975); *Commonwealth v. Groff,* 356 Pa.Super. 477, 514 A.2d 1382 (1986).

The evidence showed that Stark had been drinking and socializing with his friends from 8:15 p.m. until 11:45 p.m. on the evening preceding the shooting. During this period he consumed five or six mugs of beer, one shot of Apple Schnapps, and a bottle of beer. Blood tests revealed that at 5:00 a.m., four hours after the shooting, Stark had a blood

alcohol content of .06 percent, and, at 7:55 a.m., almost seven hours after the shooting, his blood alcohol content was .01 percent. The parties stipulated that based upon these test results and Stark's rate of metabolism, Stark's blood alcohol content at the time of the shooting was .12 percent. Stark argues that because the law presumes that a person with a blood alcohol content of .10 percent or greater is intoxicated, the jury could not properly have found that he was capable of forming a specific intent to kill. We disagree.

Merely because the alcohol in a person's blood may permit a jury to infer that he was under the influence of alcohol to a degree which rendered him incapable of safely operating a motor vehicle (see: 75 Pa.C.S. § 3731(a)(4)) does not establish that he was so intoxicated that he was incapable of forming an intent to kill. *Commonwealth v. Rose, supra* 463 Pa. at 267 n. 3, 344 A.2d at 825 n. 3. The law prohibiting the operation of a vehicle while under the influence of alcohol is concerned with the degree of intoxication which renders one incapable of acting and reacting prudently to changing circumstances and conditions which frequently confront operators of motor vehicles on the public highways. See: *Commonwealth v. Griscavage*, 512 Pa. 540, 544, 517 A.2d 1256, 1258 (1986). The statute relating to intoxication as a defense to the crime of first degree murder, on the other hand, is concerned with that high degree of intoxication which renders a person so overwhelmed by alcohol as to lose control of his or her faculties and be incapable of thinking clearly enough to form a specific intent to kill. This is a much higher degree of intoxication than that necessary to render one incapable of safe driving.

In the instant case the evidence showed that Stark had been in sufficient control of his faculties immediately prior to the shooting so that he could drive, without incident, from the 227 Bar to his trailer home and then to Hoover's apartment. Not only did he have the presence of mind to plan the details of the murder prior to arriving at Hoover's

apartment, he also was sufficiently coherent to distinguish between weapons to be used to effectuate the crime. Moreover, he was sufficiently alert to realize the need to "sneak" up the stairs to the apartment so as not to "tip anyone off" as to his presence. Finally, Trooper Lampman and the other police officers who had come into contact with Stark shortly after the incident testified that he then appeared to be in control of his faculties. These factors, considered together with Stark's ability to remember clearly the details of the events which had occurred about the time of the murder, were sufficient to enable a jury to conclude that Stark had been capable of forming a specific intent to kill.

Prior to trial, Stark filed a motion to suppress all of the incriminating statements which he had made on the day of his arrest, both at the murder scene and subsequently at the police station. The trial court granted the motion in part and denied it in part. Stark argues that this was error. He contends that some of these statements should have been suppressed because they were made prior to the time that police advised him of his constitutional rights. The remainder of the statements should have been suppressed, he argues, because he did not knowingly and voluntarily waive his rights.

> Our responsibility on review [of a suppression order] is "to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." ... In making this determination, this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.

*Commonwealth v. Lark,* 505 Pa. 126, 129, 477 A.2d 857, 859 (1984), quoting *Commonwealth v. Kichline,* 468 Pa. 265, 280–281, 361 A.2d 282, 290 (1976) (citations omitted). See: *Commonwealth v. DiNicola,* 348 Pa.Super. 405, 409, 502 A.2d 606, 608 (1985).

The evidence in the instant case showed that Officer Brian Rockwell, of the Old Lycoming Police Department, had been the first law enforcement official to arrive at the scene of the murder. Upon his arrival, at or about 1:30 a.m., he encountered two men standing outside the apartment building. Upon seeing Rockwell, one of the men stated that someone had been shot and that the other man (Stark) had done it. Stark then said: "I shot him." As Officer Rockwell began to pat Stark down, Stark said that the gun was on the table and that the victim was upstairs. Rockwell then held Stark by his belt and led him upstairs to Hoover's apartment. As Rockwell was inspecting the scene, Corporal Mark Lusk arrived and, upon seeing the victim's body asked: "What happened?" Stark replied: "It's simple. I shot the man." [2] Lusk placed Stark under arrest and led him downstairs to a police car, where he advised him of his constitutional rights under *Miranda*. Stark told Lusk that he understood his rights and wished to talk to Lusk without having an attorney present. Lusk asked Stark a number of questions about himself for identification purposes. Although Lusk did not ask any questions about the shooting, Stark offered several spontaneous statements about it. Both Officer Rockwell and Corporal Lusk testified that Stark appeared calm, coherent and in control of his faculties. Neither officer noticed an odor of alcohol about Stark, and both testified that Stark had no difficulty walking.

A short time later, at or about 3:10 a.m., Trooper Lampman arrived at the scene and questioned Stark about the shooting. During this interview Stark gave a full confession. Lampman testified that Stark had been advised of his rights several times before he questioned him and that Stark had voluntarily waived his rights both orally and in

---

2. The suppression court ordered that this statement be suppressed because it was made pursuant to a question by a police officer after Stark had been taken into police custody and before he had been advised of his *Miranda* rights. The Commonwealth has not contested this finding. In all other respects, the suppression court denied the motion to suppress.

writing. Lampman further testified that Stark had appeared calm, alert and in control of his actions at this time.

At 4:10 a.m., Stark was again advised of his constitutional rights. After again waiving them, Stark consented to a search of his automobile and agreed to provide urine and blood samples for analysis. Stark was then transported to Williamsport Hospital, where the samples were obtained. Upon leaving the hospital, Stark was taken to the State Police Barracks, where at 5:25 a.m., he was once again advised of his rights. After Stark had again waived his rights both orally and in writing, he gave a tape recorded confession. At approximately 7:45 a.m., after Stark had again been told of his *Miranda* rights, he was returned to the Williamsport Hospital for the purpose of providing additional blood and urine samples. After this procedure had been completed, Stark was taken back to the police barracks where he made a videotaped confession at 9:00 a.m.

■ Stark argues that the initial statements to Officer Rockwell should have been suppressed because he had not been advised of his *Miranda* rights when he admitted the shooting. The trial court found, however, that Stark had not been taken into custody until Officer Rockwell held him by his belt and led him upstairs to Hoover's apartment. Therefore, the court concluded, there had been no duty to advise Stark of his rights prior to that time. We agree with the court's assessment. See: *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. Chako,* 500 Pa. 571, 459 A.2d 311 (1983). Stark's statements to Officer Rockwell, moreover, were not made in response to any questions asked by Rockwell. They were spur of the moment statements and were given freely and voluntarily. At this time, therefore, there had been no police interrogation; and, consequently, there was no basis for suppression. See: *Miranda v. Arizona, supra; Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Commonwealth v. Chako, supra.* The trial court did not err in refusing to suppress these early statements.

 Stark contends that the remainder of his incriminating statements should have been suppressed because when made he was too intoxicated to waive his constitutional rights knowingly and intelligently.[3] However,

> [t]he fact that an accused has been drinking does not automatically invalidate his subsequent incriminating statements. The test is whether he had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it. Recent imbibing or the existence of a hangover does not make his confession inadmissible, but goes only to the weight to be accorded to it.

*Commonwealth v. Smith*, 447 Pa. 457, 460, 291 A.2d 103, 104 (1972). See: *Commonwealth v. Seibert*, 274 Pa.Super. 184, 188, 418 A.2d 357, 359 (1980).

Here, the law enforcement officials who interviewed Stark testified that he had been alert, coherent and in control of his faculties and stated that he understood his rights and agreed to waive them. Other evidence supported the suppression court's conclusion that Stark had not been too intoxicated to make a voluntary waiver of his constitutional rights. The record provides no basis for interfering with the suppression court's findings.[4]

 We also find no merit in Stark's contention that his final, videotaped confession should have been suppressed because he had not been re-advised of his constitutional rights immediately prior to giving that statement. In *Com-*

---

**3.** Stark's argument that his waiver was invalid because he had not been informed of the general nature of the transaction giving rise to the investigation prior to being questioned is frivolous. The record leaves no doubt that Stark knew that the police were investigating the murder which he had just committed. Stark was present when Officer Rockwell was informed by another person at the scene that someone had been shot and offered information about the shooting on his own initiative. Moreover, both the questions that were subsequently asked of Stark and his answers thereto demonstrate unequivocally that Stark knew the nature of the occurrence that was under investigation.

**4.** For the same reasons, we find no merit in Stark's contention that his consent to the warrantless search of his vehicle had been involuntary because of intoxication.

*monwealth v. Bennett,* 445 Pa. 8, 282 A.2d 276 (1971), the Supreme Court said:

> There is no prophylactic rule that a suspect must be rewarned of his constitutional rights each time custodial interrogation is renewed. Instead, we must view the totality of circumstances in each case to determine whether such repeated warnings are necessary....
>
> Pertinent to such an inquiry are the length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether statements obtained are materially different from other statements that may have been made at the time of the warnings.

*Id.,* 445 Pa. at 15, 282 A.2d at 279–280. See: *Commonwealth v. Dixon,* 475 Pa. 365, 370–371, 380 A.2d 765, 767 (1977); *Commonwealth v. Upchurch,* 355 Pa.Super. 425, 431, 513 A.2d 995, 998 (1986); *Commonwealth v. Benjamin,* 346 Pa.Super. 116, 123–124, 499 A.2d 337, 341 (1985).

In the instant case, the suppression court found that Stark had been advised of his rights at 1:40 a.m., 3:10 a.m., 5:25 a.m. and again at 7:10 a.m. The videotaped confession was given at the State Police Barracks, which is also where the 5:25 a.m. warnings had been given. Moreover, the videotaped interrogation was conducted by Trooper Lampman, who had also conducted prior interrogations at 3:10 a.m. and 5:25 a.m. Finally, the statements made during this final confession were consistent with prior statements which Stark had made following prior warnings. Under these circumstances, it was not necessary that Stark be rewarned of his rights under *Miranda* before his videotaped confession.

■ At trial, Stark called Dr. Robert Sadoff, a psychiatrist, as an expert witness. Dr. Sadoff testified that in his opinion Stark had not gone to Hoover's apartment with the intention of killing him, but, rather, had shot Hoover only because he believed that it was necessary to save his own

life. Dr. Sadoff testified that his opinions were based upon examinations of Stark, as well as the statements which Stark had made after his arrest and the police investigative reports. In actuality, Dr. Sadoff's conclusions had been based, in significant part, upon the results of a sodium amytal (truth serum) test to which Stark had submitted under Sadoff's supervision. The trial court refused to permit the witness to testify regarding the test. Stark argues that this was error. Although he does not argue that the test results themselves should have been received in evidence, he contends that Dr. Sadoff should have been permitted to testify that his opinions regarding Stark's state of mind were based in part upon the results of the sodium amytal test.

It is well settled that the results of truth serum tests, like those of polygraph tests, are not admissible in trials in this Commonwealth because they lack scientific reliability. See: *Commonwealth v. White*, 271 Pa.Super. 552, 555, 414 A.2d 391, 393 (1979); *Commonwealth v. Butler*, 213 Pa.Super. 388, 392, 247 A.2d 794, 796 (1968). See also: *Commonwealth v. Talley*, 456 Pa. 574, 578, 318 A.2d 922, 924 (1974); *Commonwealth v. Brooks*, 454 Pa. 75, 78, 309 A.2d 732, 733–734 (1973); *Commonwealth v. Camm*, 443 Pa. 253, 269, 277 A.2d 325, 333 (1971), *cert. denied*, 405 U.S. 1042, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972); *Commonwealth v. Saunders*, 386 Pa. 149, 157, 125 A.2d 442, 445 (1956); *Commonwealth v. Upchurch, supra,* 355 Pa.Superior Ct. at 431, 513 A.2d at 998. Therefore, Dr. Sadoff could not have testified to the results of the test nor to any statements which had been made by Stark while the test was in progress. It seems also that to have permitted the expert to state his opinions with regard to Stark's state of mind and to inform the jury that those opinions were based upon the truth serum test would have had the same practical effect as permitting the psychiatrist to testify to the test results in the first instance. To permit an expert witness' opinion to be fortified by evidence deemed too unreliable to be submitted to the jury is not a result which we are willing to sanction. Indeed, it may well be that any opinion based

upon the results of such a test should also be excluded. That issue, however, is not presently before us. It is enough for our purposes that the trial court did not err in disallowing Dr. Sadoff's testimony that a sodium amytal test had been administered and that his opinion was based thereon. Compare: *People v. Cox*, 85 Mich.A̱. 314, 271 N.W.2d 216 (1978) (sodium amytal test results and expert's opinion based upon them deemed unreliable and inadmissible).

■ During the Commonwealth's case in chief, Rick George was called to testify, inter alia, regarding Stark's consumption of alcohol before the shooting. During cross-examination, the following exchange occurred between defense counsel and the witness:

Q: I believe you told the investigator that [Stark] might have been a little high?

A: Possibly.

Q: What did you mean by that statement?

A: [Stark's] been known to smoke a little bit of marijuana.

Defense counsel requested that a mistrial be declared. The trial court refused to declare a mistrial but did instruct the jury that the response was being stricken from the record and should not be considered by them in any way. Stark now argues that a mistrial should have been declared.

The statement complained of by appellant was elicited by defense counsel. Moreover, counsel might reasonably have anticipated the possibility of such an answer, for he had knowledge of Stark's drug use. The trial court did not err when it denied a defense motion for mistrial. See: *Commonwealth v. Raymond*, 412 Pa. 194, 206, 194 A.2d 150, 156 (1963), *cert. denied*, 377 U.S. 999, 84 S.Ct. 1930, 12 L.Ed.2d 1049 (1964); *Commonwealth v. McGonigle*, 228 Pa.Super. 345, 349, 323 A.2d 733, 734–735 (1974); *Commonwealth v. Dalton*, 199 Pa.Super. 388, 393–394, 185 A.2d 653, 656 (1962). Compare: *Commonwealth v. Rivers*, 238 Pa. Super. 319, 357 A.2d 553 (1976).

■ Stark also contends that the trial court erred by permitting the Commonwealth to present to the jury a videotaped showing of his being photographed and finger-printed at the State Police Barracks following arrest. This videotape, it is argued, was unduly prejudicial because from it a jury could infer that Stark was guilty. The prejudice was compounded, Stark urges, because the videotape showed Stark saying: "I always wanted to know what it would be like to be a criminal."

The trial court determined that the videotape was relevant to refute Stark's claim that he had been too intoxicated to form a specific intent to kill or to know what he was saying when he confessed to the shooting. The videotape was offered so that the jury could see that Stark had, in fact, been coherent and in control of his faculties. The trial court also found that Stark's statement that he wanted to know what it was like to be a criminal was relevant as evidence tending to establish the necessary mens rea for first degree murder. With regard to Stark's allegation of undue prejudice, the trial court found that the videotape, although damaging to Stark's defense, was not of a type that would inflame the jury or distract it from the totality of the evidence offered by the parties. Therefore, the trial court permitted the videotape to be viewed by the jury. We perceive no abuse of discretion.

[A] basic requisite for the admissibility of any evidence in a criminal case is that it be competent and relevant. *Commonwealth v. Potts,* 314 Pa.Super. 256, 460 A.2d 1127 (1983). Evidence is relevant when it tends to establish facts in issue or in some degree advances the inquiry and thus has probative value. *Commonwealth v. Sinwell,* 311 Pa.Super. 419, 457 A.2d 957 (1983). Not all relevant evidence is admissible, however, and the trial court may exercise its discretion to exclude evidence that, though relevant, may confuse, mislead, or prejudice the jury. *Commonwealth v. Perry,* 307 Pa.Super. 327, 453 A.2d 608 (1982). Since rulings on the relevancy of evidence rest within the sound discretion of the trial court,

they will not be reversed absent a manifest abuse thereof. *Commonwealth v. Costanzo*, 269 Pa.Super. 413, 410 A.2d 324 (1979).

*Commonwealth v. Lumpkins*, 324 Pa.Super. 8, 14–15, 471 A.2d 96, 99–100 (1984). See: *Commonwealth v. Shain*, 324 Pa.Super. 456, 462–463, 471 A.2d 1246, 1248–1249 (1984).

■ During closing argument, the trial court, over defense objection, permitted the prosecutor to replay selected portions of Stark's tape recorded confession. Stark argues that this prevented the members of the jury from deciding the case from their recollection of the evidence and, therefore, constituted prejudicial error. The recorded statement had been fully proved and had properly been received into evidence. Therefore, it could be referred to, quoted, or emphasized by either counsel during closing arguments.

In *Commonwealth v. Wise*, 298 Pa.Super. 485, 444 A.2d 1287 (1982), the defendant had been convicted of robbery and related offenses. On appeal, he argued that the trial court had erred when, during closing argument, it permitted the jury to look at photographs which had been taken during the robbery. This Court disagreed, holding that since the photographs had been introduced as evidence, the prosecutor's use of them for illustration purposes during closing argument did not constitute the creation of new evidence and was not improper. *Id.*, 298 Pa.Superior Ct. at 490–491, 444 A.2d at 1289–1290. See also: *Commonwealth v. Burton*, 459 Pa. 550, 330 A.2d 833 (1975) (new trial not warranted where during closing argument prosecutor handled weapons which had been introduced as Commonwealth exhibits).

In the instant case, the recorded confession had been received into evidence during trial. Therefore, the prosecutor's use of it during his closing to illustrate his arguments regarding Stark's intent on the night of the murder was not error.

■ After the period for filing post-trial motions had expired, Stark's attorney received information suggesting

that a member of the jury had not agreed with the verdict and had been coerced into agreeing with the verdict by other members of the jury. Defense counsel was in touch with the juror and was told, in addition, that the juror believed another juror had incorrectly answered a question propounded by the defense during voir dire. Appellant's counsel thereupon filed a petition for leave of court to file additional post-trial motions nunc pro tunc. The trial court dismissed the petition. Stark contends that this was error.

In *Commonwealth v. Patrick*, 416 Pa. 437, 206 A.2d 295 (1965), the Supreme Court held that the trial court had not erred by refusing to consider the affidavit of a juror averring that he had been coerced into agreeing to the verdict by his fellow jurors. The Court said: "Our courts have repeatedly held for over 150 years that after a verdict is recorded, and after the jury has separated and been discharged, jurors may not invalidate or impeach a verdict by their own testimony." *Id.*, 416 Pa. at 442, 206 A.2d at 297 (citations omitted). There can be no doubt, therefore, that the trial court in the instant case did not err when it refused to consider the juror's averment that she had been coerced by the other members of the jury to agree to a verdict of guilty of murder of the first degree.

■■■ Stark's petition also alleged that a new trial was necessary because a juror had falsely answered the following question during voir dire: "Have any of you been separated or divorced from your husband or wife because of the fact that your best friend or a friend of yours had been dating your husband or wife?" According to Stark's offer of proof, the juror who had come forward would testify that during deliberations another juror had said that her husband had run away with the babysitter. Stark contends that because the juror did not reveal this fact in response to the above-quoted question, he was denied the right to a fair and impartial jury. We disagree.

In *Brown v. United States*, 356 F.2d 230 (10th Cir.1966), the defendant had been charged with murder. During voir dire, defense counsel asked the potential jurors whether

they "or anyone in their immediate family" had ever been the victim of an attack upon their person. None of the potential jurors indicated a positive response, and a jury was seated. After defendant had been convicted of murder in the second degree, it was learned that a brother of one of the jurors had been murdered during the years prior to trial. Defendant filed a motion for new trial, contending that he had been denied a fair trial and had been denied the effective use of his peremptory challenges. The trial court denied the motion and defendant appealed. In affirming defendant's conviction the Court of Appeals said:

> Certainly the voir dire oath administered to potential jurors obligates them fully to tell the truth. However, no reason appears for concluding that the juror was in fact not fully responsive to the actual interrogatory, which referred to the juror's "immediate family." Such a term is indeed ambiguous, for depending upon such circumstantial variables as age and marital status, it can import different meanings to different individuals. Defense counsel was free to explain to the jury what was meant by "immediate family", and could have expanded his inquiry to include "family" and "relatives", but he elected to pursue the point no further. It cannot be presumed that the juror's failure to respond to the question was not proper, and an inference of intentional or inadvertent non-disclosure is unwarranted.
>
> . . . .
>
> Disruptive consequences to the trial of criminal cases are suggested by permitting defense counsel to come forth after conviction and successfully contend that, notwithstanding the absence of actual bias, and notwithstanding his own failure sufficiently to pursue voir dire inquiry to expose possible predilections on the part of a prospective juror, that nevertheless probable prejudice must be imputed to the juror as a matter of law and a new trial thereafter granted. "A disqualification which by reasonable diligence could have been discovered before verdict, may not afterwards be made the subject of an attack upon a verdict." *Spivey v. United States*, 5 Cir.,

109 F.2d 181, 186, cert. denied 310 U.S. 631, 60 S.Ct. 1079, 84 L.Ed. 1401.

*Brown v. United States, supra* at 232–233.

In the instant case, defense counsel's question was ambiguous; it is not at all clear that it was intended to refer to the conduct between a juror's husband and a babysitter. Thus, there is no basis for inferring from the averments contained in Stark's petition that the juror had falsified her answer to the question asked. In the absence of a false response, we will follow the reasoning of the Tenth Circuit and conclude that Stark may not now rely upon the juror's comment during deliberations to attack the verdict.

Judgment of sentence affirmed.