661 A.2d 422

**COMMONWEALTH of Pennsylvania**

v.

**Steve IMPELLIZZERI, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 15, 1995.

Filed June 12, 1995.

300

Albert P. Massey, Jr., Frazier, for appellant.

Jacquelyn C. Paradis, Asst. Dist. Atty., Allentown, for com., appellee.

Before WIEAND, BECK and BROSKY, JJ.

BECK, Judge:

In this appeal involving convictions for several crimes including rape and involuntary deviate sexual intercourse, we address, *inter alia,* the admissibility of certain sexually explicit materials. Finding none of appellant's challenges to his judgments of sentence meritorious, we affirm.

*FACTUAL AND PROCEDURAL HISTORY:*

Late one August evening in 1991, the victim, a twenty-three year old female, spent some time with friends, first at a local bar and later at a restaurant. While at the restaurant, the victim called her mother, with whom she lived, to let her know her whereabouts and to explain that she would be home soon. Upon leaving the restaurant, the victim drove one of her friends, Allison, to a nearby Ramada Inn. Allison worked at the hotel and her car was parked there. The victim waited for Allison while she went into the hotel so that the two could "follow one another home" in their cars.

While the victim waited in her car for Allison at a rear exit door, appellant opened the passenger side door, got into the

car and at point of knife, commanded her to drive from the hotel parking lot. Once on the road, appellant took over at the wheel and continued to hold the victim at knifepoint as she huddled on the passenger side floor. He drove the victim to his home, dragged her out of the car and forced her inside his house to the bedroom. He pushed the victim on the bed, removed her clothes and, using neckties, tied her right wrist to her right ankle and her left wrist to her left ankle.

Once the victim was securely bound and no longer able to resist him, appellant subjected her to a series of forced, brutal indignities, including vaginal intercourse, anal intercourse and oral sex. Throughout the entire episode, while the victim screamed and cried, appellant ignored her pleas to be set free. After his vicious attack, appellant covered the victim's head with a shirt, picked her up and carried her to his basement. There, he tied her with a rope, binding all of her limbs together. The victim testified that the rope was also tied around her neck. Though she could not see, she explained that her position, and the pain she experienced whenever she moved, made her feel as though she was suspended from the ceiling. Appellant put a gag in the victim's mouth and went upstairs.

Several times, the victim was able to push the gag out and scream for help. Each time, appellant reappeared and forced the gag back in. He told the victim that he was sure she would "talk" and that he "had to think." Somehow, the victim managed to free herself of the restraints and after groping about in the dark basement, turned on a light. She located a window, opened it and punched out the screen behind it. Using a bolt that jutted out of the wall, she hoisted herself up and escaped through the window.

The victim, who was unfamiliar with the area, ran naked into the street and was helped by Christopher Schew, who was on his way home from work. Schew gave the victim his shirt, drove her past appellant's house so that she could identify it, and took her to a nearby convenience store where they found a police officer. The victim told police what had happened to her and she was placed in a police car. The officers then

followed Schew back to the location the victim had shown him. There, the victim identified appellant's house and showed police the basement window and screen through which she had escaped. The victim was transported to the hospital while police set up surveillance of the residence and waited for the search warrant team to arrive.

At the hospital, medical personnel and the victim's parents observed that the victim was crying and distraught. She suffered ligature marks on her wrists and ankles, rope burns, cuts and a swollen lip. A physical examination revealed that her vaginal and anal areas were swollen and red and that she had a laceration in the perineal area. Samples collected from her vagina and anus showed the presence of acid photophase (found in semen and pre-ejaculate fluid) and sperm. After her medical treatment, the victim was transported to the police station where she was interviewed and photographed.

Several hours later police secured a warrant for appellant's home and commenced a thorough search of the residence. In the basement, they observed many of the things the victim had described; they also recovered a rug and a pair of child's sweatpants, both of which had blood stains that matched the victim's blood type. The victim later explained that the sweatpants were used as the gag that prevented her from screaming while in the basement. The police did not find any of the victim's clothing or personal effects in the house.

Appellant did not return to his home while the police were there. Instead, he turned himself in to police later that day. The victim's car was located several days later in a lot near the Ramada Inn. It did not contain any of her personal effects, though the keys were found on the floor.

At trial, appellant claimed that he had met the victim at a bar earlier in the evening and made arrangements to meet her later at the Ramada Inn. They met as planned and appellant took her to his home where the two engaged in various types of consensual sex that included the victim being tied up voluntarily. Appellant testified that during their sexual encounter, the victim was quite aggressive and encouraged him

to continue despite his difficulty in maintaining an erection. He claimed the victim enjoyed herself immensely until she realized that he could no longer perform. At that point, he testified, she became angry and violent, and he was forced to throw her out of the house. Appellant insisted that the victim left his home through the front door. He explained that she was familiar with the basement because he took her on a tour of it that night and used the opportunity to do some laundry.

The jury wholly rejected appellant's version of events and found him guilty of Rape, Involuntary Deviate Sexual Intercourse, Aggravated Assault, Indecent Assault, Kidnapping, Unlawful Restraint, False Imprisonment, Recklessly Endangering Another, Theft, Receiving Stolen Property and Unauthorized Use of Auto. He was sentenced to a total term of imprisonment of twenty to forty years. After denial of his post verdict motions and his motion to reconsider sentence, appellant filed this appeal. We will address each of his allegations of error.

*VOIR DIRE:*

Appellant's first issue concerns errors alleged to have taken place during jury selection. He argues that his counsel was forced to use peremptory challenges on two prospective jurors who should have been struck for cause. The trial court denied appellant's request to strike the jurors for cause and appellant insists that this was reversible error.

 Where a criminal defendant is forced to use a peremptory challenge to excuse a juror who should have been excused for cause, and then exhausts his peremptory challenges before the jury is seated, a new trial will be granted. *Commonwealth v. Johnson,* 299 Pa.Super. 172, 445 A.2d 509, 514 (1982). A strike for cause typically is requested by one of the parties after questioning of a juror has elicited responses that establish that he or she cannot be impartial. *Id.* at 175–77, 445 A.2d at 511. Jurors should be disqualified for cause when they do not have the ability or willingness to eliminate the influences under which they are operating and therefore cannot render a verdict according to the evidence. *Common-*

*wealth v. DeHart,* 512 Pa. 235, 516 A.2d 656, 663 (1986), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987).

The jurors at issue here both stated that they read newspaper accounts of the crime and were uncertain whether they could be fair about the case. Upon further questioning by the court, the jurors stated that they believed they could put aside their emotions, follow the law as directed by the judge and render a decision based on the facts presented in court. One of the two jurors thereafter told appellant's attorney that she was not sure she could put aside her emotional reaction.

 In considering this issue, we employ a standard of review which affords great deference to the trial judge who is in the best position to assess the credibility of the jurors and their ability to be impartial. *See Commonwealth v. Smith,* 518 Pa. 15, 540 A.2d 246, 256 (1988) (determination of juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record). Where a prospective juror indicates that he or she cannot be an impartial juror, "much depends upon the answers and demeanor of the potential juror as observed by the trial judge." *Johnson, supra* at 177, 445 A.2d at 512. Reversal by an appellate court is appropriate only in the case of palpable error. *Id.* However, it is not the court's function to persuade a prospective juror to put aside his or her influences, but only to determine if such can and will be done. *Id.* at 181–82, 445 A.2d at 514.

 Individuals are not expected to be free from all prejudices in order to sit on a jury and the burden here is on appellant to establish that the challenged jurors possessed a "fixed, unalterable opinion that prevented [them] from rendering a verdict based solely on the evidence and the law." *Smith, supra* at 36, 540 A.2d at 256. Considering the deference we are required to show the trial court's conclusions, and based on the entire voir dire transcript, we cannot find that appellant met his burden. While the jurors were at times equivocal, the record reveals support for the trial court's denial of disqualification for cause.

## ADMISSION OF VIDEOTAPED EVIDENCE:

Appellant's next allegation of error concerns the admission of a videotape offered by the prosecution. The videotape responded directly to evidence offered by appellant. As part of his defense, appellant presented the testimony of an investigator who, among other things, testified to the conditions of appellant's basement where the victim was held captive. The investigator testified that no dust was disturbed on the overhead pipes and beams, the inference being that things could not have occurred as the victim alleged since she claimed to have been tied to the ceiling. Clearly the purpose of offering the investigator's testimony was to discredit the victim's version of events and strengthen appellant's, who claimed that the victim was not held against her will and left the house through the front door.

In addition to the lack of a "disturbance" in the basement ceiling, the investigator also testified to the location of the window from which the victim made her escape. Specifically, the investigator was asked by appellant's counsel to examine the window to determine if someone could have exited through it. With the assistance of photographs, the investigator testified at length regarding the location of the window, the placement and condition of the bolt or spike beneath the window and the size and condition of the torn screen. Referring to the "window that [the victim] supposedly climbed through," the investigator testified that the height from the floor to the window frame was sixty-two (62) inches and the height from the floor to the exterior screen was sixty-six and one-half (66½) inches. The investigator then noted that the victim stood only sixty-one (61) inches tall.

In order to rebut the investigator's testimony, the prosecution presented a videotape showing a female of the same height and weight as the victim crawling out of appellant's basement.[1] Appellant objected to the use of the tape at trial

1. A secretary from the District Attorney's office whose height and weight matched those of the victim climbed from the basement window, with the assistance of the spike protruding from the wall, in approximately 50 seconds.

on the basis that it was improper for the Commonwealth to use someone other than the victim to establish that the victim would have been able to exit from the window. In his brief, appellant argues that admission of the videotape was erroneous for a number of reasons, including improper authentication, lack of relevance and probative value, and undue prejudice.

With respect to the admission of evidence, the trial court has broad discretion and will not be reversed absent an abuse of that discretion. *Commonwealth v. Stark,* 363 Pa.Super. 356, 526 A.2d 383, 391 (1987), *appeal denied,* 517 Pa. 622, 538 A.2d 876 (1988). The trial court should not admit evidence that has no relevance to a case. Relevant evidence is that which tends to establish facts in issue or in some degree advances the inquiry and is therefore probative. However, even relevant evidence may be excluded where the trial judge, in his or her discretion, finds that admission may confuse, mislead or prejudice the jury. *Id.* The probative value of a piece of evidence cannot be outweighed by its prejudicial impact.

In addition to the standard requirement of relevance, videotaped evidence requires additional scrutiny by the trial court prior to admission. First, like a photograph, a videotape must be authenticated. *See Commonwealth v. Wiltrout,* 311 Pa.Super. 115, 457 A.2d 520, 523 (1983). It is not necessary that the maker of the videotape testify to the tape's accuracy; any witness familiar with the subject matter can testify that the tape was an accurate and fair depiction of the events sought to be shown. *Id.; Commonwealth v. Hindi,* 429 Pa.Super. 169, 631 A.2d 1341, 1346 (1993). Second, because a videotape by its nature has the potential to make a stronger impact than oral testimony, the trial judge should view the tape *in camera* prior to showing it to the jury. *Hindi, supra,* at 175–77, 631 A.2d at 1345. This is particularly true where the opposing party claims that the tape is overly prejudicial.

The tape at issue here was not an actual depiction of the criminal episode, as in *Hindi.* It was instead a demonstration offered to rebut the testimony of appellant's expert and establish a fact in issue. Despite the different nature of the tape, the requirements of relevance, authentication and *in camera* review remain important. *See Reimer v. Delisio,* 296 Pa.Super. 205, 442 A.2d 731, 737–38 (1982), *affirmed,* 501 Pa. 662, 462 A.2d 1308 (1983). *See also Commonwealth v. Henry,* 524 Pa. 135, 569 A.2d 929, 936 (1990) (experimental evidence is admissible only if the conditions under which the experiment was conducted are substantially similar to those at the time of the event in question), *cert. denied,* 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991).

On cross-examination, appellant's counsel asked the witness who appeared on the videotape if she knew whether the conditions of the basement window and wall were the same on the day of the experiment as they were on the day of the crime. The witness admitted she did not, but counsel made no argument to the trial judge that the witness's lack of knowledge on this point resulted in the Commonwealth's failure to authenticate the tape. It appears then that the authentication issue was waived. However, even if we assume the issue was properly preserved, the record reveals that one of the detectives involved in the investigation testified that the condition of the window and wall were the same on the day of the crime as they were on the day the videotaped experiment took place, thereby authenticating the tape.

We reject appellant's contention that it was prejudicial for the jury to observe someone other than the victim attempting to exit from the basement.[2] It was sufficient to use someone of the same height and weight as the victim, particularly in light of the investigator's testimony which focused on the height of the window. *See Commonwealth v. Sero,* 478 Pa. 440, 387 A.2d 63, 68 (1978) (conditions need only be substantially similar, not identical).

**2.** We agree with the trial court that use of the victim in this instance may have created prejudice rather than avoided it.

It is clear that the trial judge admitted the tape without reviewing it. While an *in camera* review is strongly advised, the failure to do so does not necessarily result in reversible error.[3] The tape in this case lasted only a few minutes. Further, it was limited to a single issue in the case, namely, whether it was possible for someone of the victim's stature to escape from the basement window. Lastly, it was the type of demonstration that was relevant and probative of an issue in the case, and presented little or no prejudice to the defense. Therefore, its admission was proper. The error in failing to preliminarily review the tape was harmless.

## ADMISSION OF SEXUALLY EXPLICIT MATERIAL:

Appellant's next issue concerns the decision of the trial court to allow the prosecution to introduce into evidence items found at appellant's residence by the police search team. During the search of appellant's home, police seized sexually explicit materials from his closet. Recovered was a publication titled "Anal Connection," which consisted of color photographs of couples and trios engaged in anal sex (the "Magazine"), as well as eleven "Hustler" magazines and two videotapes depicting various sexual acts, including anal sex (the "other sexually explicit materials"). Prior to trial, appellant filed a motion *in limine* seeking to prevent the prosecution from introducing any of the items found in the closet. At argument on the motion, the Commonwealth stated that it would forego use of the other sexually explicit materials if it was permitted to use the Magazine. The court ruled in the Commonwealth's favor and the trial went forward.

On direct examination, a member of the police search team testified to finding the Magazine and described, generally, its contents. It does not appear from the record, and appellant makes no such assertion, that the Magazine itself was shown to the jury. During appellant's direct examination, his counsel

3. *In camera* review is advisable in the case of videotaped evidence because it can aid in avoiding reversible error. Like an offer of proof for oral testimony, it allows the trial judge to determine, before admission, whether the opposing party's claim of prejudice is valid.

questioned him about his possession of the Magazine and he replied that a co-worker gave him the publication two years earlier, that he had no particular interest in it and that he intended to save it for a friend who collected those kinds of things. On cross-examination, when asked if he often saved these kinds of materials for his friend, appellant replied negatively, stating that he didn't have many of these kinds of materials.

After this response from appellant, the prosecutor approached the bench and requested that she be permitted to question appellant about the other sexually explicit materials found in his home, arguing that appellant had "opened the door" to this inquiry. Appellant's counsel objected, insisting that it was the prosecutor who first raised the issue by asking whether appellant "saved *all* of his materials to give to his friend." The trial judge ruled in the Commonwealth's favor.

On appeal, appellant alleges two errors with respect to the trial court's evidentiary rulings. First he claims that admission of the Magazine was improper because it was not probative of any of the issues in the case and, even if relevant, was overly prejudicial. Second, he argues that under the law of the case doctrine, the trial court erred in allowing the Commonwealth's attorney to question appellant about the other sexually explicit materials.

We first address the admissibility of the Magazine. At argument on the motion *in limine*, the prosecutor conceded that the other sexually explicit materials seized from appellant's residence did not tend to establish that appellant committed the crimes with which he was charged. However, the prosecutor argued strenuously that the Magazine was different because it depicted activity that "was not the normal type of sexual behavior," and instead was "out of the ordinary" or "aberrant." Therefore, the prosecutor reasoned, the Magazine was relevant to show the type of sexual activity appellant liked and to corroborate the victim's claim that forcible anal sex occurred.

Appellant's counsel argued that the Magazine was irrelevant because the Commonwealth could not establish a nexus between it and the crimes charged. Counsel stated that without expert testimony, the Commonwealth could not assert that anal sex was "not the norm." Further, appellant's mere possession of the publication did not tend to establish that he forced the victim to engage in anal sex involuntarily. The court admitted the Magazine because it found "[appellant's] possession of the magazine, indicating an interest in anal sex, make[s] the allegation that anal sex occurred more probable." Trial Court Op. at 10.

In determining whether and to what extent the Magazine was probative of an issue in this case, we look to case law addressing the admission of sexually explicit materials in rape and sexual assault cases. Our research reveals, and the parties have cited, no Pennsylvania cases directly on point. The prosecution relies on *Commonwealth v. Moore*, 389 Pa.Super. 473, 567 A.2d 701 (1989), for authority that the Magazine was probative and admissible. However, that case differs significantly from the instant case. In *Moore*, the appellant was convicted of rape, involuntary deviate sexual intercourse and related offenses in connection with his assault on an eleven year old girl on her way to school. At the time of the crime, the perpetrator carried a blue gym bag and a jar of Vaseline. Also, the victim found a pornographic magazine at the scene of the assault. When arrested several months later, the appellant had in his possession a grey gym bag, a jar of Vaseline and a pornographic magazine, all of which were admitted at trial.

This court ruled that the items admitted were probative because they tended to establish the identity of the attacker. *Id.* at 481–83, 567 A.2d at 706. Here, the Commonwealth argues that the Magazine tended to establish the identity of appellant's "sexual interests which deviate from the norm," and therefore admission was proper under *Moore*. We decline to analogize the cases in this manner.

At issue in *Moore* was whether the accused was the person who committed the crime. Therefore, evidence which tended

to corroborate the identifying features of the perpetrator was probative of that issue. Here, appellant's defense was consent or lack of force. His claim, however implausible in light of the evidence, was that the victim was a willing participant. In rape cases, the concepts of consent and force often are linked. Although the lack of the former does not necessarily establish the existence of the latter, *see Commonwealth v. Berkowitz,* 537 Pa. 143, 641 A.2d 1161 (1994), under the facts of this case, force and consent are inextricably intertwined. If the victim did not consent, then force had to have been used. According to the victim, everything that occurred was against her will; according to appellant, everything that occurred was consensual.

We cannot say that appellant's possession of the Magazine depicting anal sex made it more likely that he forced his victim to engage in that activity any more than we could conclude that his possession of a "Hustler" magazine made it more likely that he forced the victim to engage in vaginal or oral sex.[4]

Admittedly, the drawing of lines with respect to the admission of sexually explicit materials is difficult. While on one hand recognizing that evidence of a sexual nature may have probative value in a sexual assault case, we cannot on the other hand confer blanket probative value on all sexual materials in all cases. In some instances, materials found in an accused's possession might very well be probative of an issue in a case. For instance, if the publication sought to be admitted here had depicted women being tied up and subjected to anal intercourse against their will, it may have been

4. The prosecution's reliance on *Commonwealth v. Costal,* 351 Pa.Super. 200, 505 A.2d 337 (1986), also fails. The *Costal* case concerned the admission of satanic materials which the appellant claimed were not relevant to the underlying murder charges. Admitted in the case were several books, posters and robes related to the appellant's satanic activities. The victims in *Costal* were the spouse and child of an individual who was a member of a satanic cult led by appellant. The murder was accomplished in a manner consistent with a satanic ritual killing. As in *Moore,* the evidence tended to show the identity of the perpetrator. The evidence, therefore, was probative of an issue in the case. Identity clearly was not an issue in this case.

probative of whether appellant forced his victim to commit those same acts. Further, if there had been allegations that appellant had shown the Magazine to the victim or in any way used the magazine during his attack on her, the probative value of the evidence would be more obvious.[5] However, as the prosecutor herself commented in this case, one's mere possession of a pornographic magazine does not tend to establish guilt in the case of rape.

Other state courts have made similar rulings in cases involving sexually explicit material. In those cases, the courts reason that where the materials seized were utilized in the commission of the crime, they were probative; however, other sexually explicit materials were not. *See e.g., Wade v. State,* 583 So.2d 965 (Miss.1991) (bag of photographs depicting persons engaged in heterosexual and homosexual acts not probative of any issue in case of sexual battery of children where photographs were not shown to victims); *State v. Natzke,* 25 Ariz.App. 520, 544 P.2d 1121 (1976) (admission of sexually explicit materials appropriate where victim testified that accused showed her such materials on several occasions).

■■■ We conclude that the Magazine had some, but little probative value on whether the sexual activity was forced or consensual under the circumstances presented in this case. We specifically disagree with the trial court's conclusion that appellant's possession of the publication, which may have indicated an interest in anal sex, made the allegation that forcible anal sex had occurred more probable. The Magazine was not sufficiently probative on the issue of forcible or consensual sex and therefore should not have been admitted.

■■■ Our conclusion that the Magazine should not have been admitted because it was not sufficiently probative does

5. Therefore, our analysis here is not to be construed as a conclusion that admission of pornographic materials in sexual assault cases hinges only on whether it tends to establish the identity of the perpetrator. As noted, in some cases the materials will be probative because they corroborate a victim's claim. There is likely a variety of other, yet to be considered, circumstances wherein admission will be probative of a fact in issue.

not end our inquiry. We must determine whether its admission constitutes reversible error. We conclude that the evidence in this case, including the testimony of the victim, the corroborating witnesses, the police and the medical professionals, was so overwhelming that any error in admitting the Magazine clearly was harmless. *See Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155, 162–64 (1978).

■ We turn now to appellant's claim with respect to admission of the other sexually explicit materials. Specifically, appellant claims that because they were deemed inadmissible by the trial court at the argument on the motion *in limine,* the court was precluded under the law of the case from "reversing" its pre-trial order.

We reject outright appellant's claim that a trial court has no authority to alter a pre-trial order. First, we note that the record establishes it was the Commonwealth who offered to forego admission of the other sexually explicit materials; the court made no findings with respect to their relevance or potential for prejudice. Second, even if the court had ruled the evidence inadmissible prior to trial, appellant is mistaken in asserting that under no circumstances could the court revisit the issue.

■ The law of the case doctrine simply does not apply here. In his brief, appellant asserts that the doctrine requires a judge to follow the decision of a colleague in the same court when that decision is based on the same set of facts. Appellant's Brief at 30, citing *Yudacufski v. Commw., Dept. of Transportation,* 499 Pa. 605, 454 A.2d 923, 926 (1982). While some of the cases upon which *Yudacufski* relies may refer to this principle as the "law of the case," this is technically incorrect. The term "law of the case" describes the principle that where an appellate court has ruled on a legal question and remanded the matter to the court below for further proceedings, the ruling as set forth by the appellate court is to be followed in all subsequent proceedings in the same action. *See* Black's Law Dictionary (5th Ed.1979). *See also Banker v.*

*Valley Forge Insurance Co.*, 401 Pa.Super. 367, 585 A.2d 504, 508, *appeal denied*, 529 Pa. 615, 600 A.2d 532 (1991).

*Yudacufski*, on the other hand, addresses those cases wherein a judge is required to follow the previous decisions of a colleague on the same court. This is *stare decisis*, the legal principle which states that judges of the same court will follow precedent within their court of jurisdiction. *See* Black's Law Dictionary, *supra*. *See also Monongahela St. Ry. Co. v. Philadelphia Co.*, 350 Pa. 603, 39 A.2d 909 (1945).

What appellant actually relies on here is the well-established rule that, absent some new evidence, it is improper for a trial judge to overrule an interlocutory order of another judge of the same court in the same case. *See Commonwealth v. Eck*, 272 Pa.Super. 406, 416 A.2d 520, 522 (1979). The purpose of this rule is to afford some degree of finality to pre-trial determinations so that the parties may rely on them. *Id.* Appellant here seeks to extend this rule and asks us to hold that under no circumstances may a trial judge reconsider his or her own pre-trial order. We, of course, decline to do so.

In the instant case, the judge's pre-trial order incorporated the agreement that the other sexually explicit materials would not be admitted. In the court's view, the facts upon which that order was entered changed during trial; that is, the judge concluded that appellant had opened the door to admission of the other sexually explicit materials. This change warranted a modification of the previously entered order. Where such a change takes place, it is not error for a trial judge to amend her own order. The concept of a party "opening the door" to allow in otherwise inadmissible evidence is not only well established, it is the only fair and just decision to be made under the circumstances.

Whether appellant truly opened the door is a separate issue. However, it is one we need not address since our analysis above regarding the admissibility of the Magazine applies equally to the admission of the other sexually explicit materials. Therefore, even if appellant did not open the door to permit testimony about the other sexually explicit materi-

als, the error, if any, in admitting them was harmless. We find no reversible error in the trial court's rulings with respect to the sexually explicit material seized from appellant's home.

### PROSECUTORIAL MISCONDUCT:

 Appellant next alleges that several comments by the Commonwealth's attorney in her closing statement to the jury constituted prosecutorial misconduct and warrant the grant of a new trial. Appellant properly cites the standard for such challenges in his brief:

> Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the grant of a new trial. Rather the focus is on what, if any, effects the comments had on the jury. A new trial is required when the effect of the District Attorney's comments "would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Faulkner,* 528 Pa. 57, 595 A.2d 28, 39 (1991) *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992) (citations omitted). Appellant's claims are many and range from allegedly improper personal opinions regarding the credibility of witnesses to inappropriate evidentiary references. We have reviewed the prosecutor's closing remarks in their entirety and conclude that even if all the allegations made by appellant are accurate, and we do not believe they are, the challenged comments did not exceed the bounds of propriety nor did they taint the jury's ability to reach a verdict based on the evidence. *See Commonwealth v. Scarfo,* 416 Pa.Super. 329, 611 A.2d 242, 283, *appeal denied,* 535 Pa. 633, 631 A.2d 1006 (1992).

### SENTENCING ERRORS:

Appellant's final issues concern his sentence. He asserts error with respect to the sentencing court's allegedly inadequate reasons for deviating from the guidelines, consideration of allegedly irrelevant evidence presented at the sentencing

hearing, and failure to consider relevant psychological evidence. Appellant's challenges address the discretionary aspects of his sentence; therefore, the substantive and procedural requirements of Pa.R.A.P. 2119(f) and *Commonwealth v. Tuladziecki*, 513 Pa. 508, 522 A.2d 17 (1987), must be met prior to our review. The Commonwealth asserts that, with respect to those requirements, appellant has failed to raise a substantial question warranting our review. As to some of the claims, we agree.[6]

Appellant claims that the sentencing court failed to place on the record sufficient reasons for deviating from the guidelines. The sentencing court is bound, whenever it deviates from the guidelines, to set forth on the record and in a defendant's presence, the "factual basis and specific reasons which compelled the court to deviate from the sentencing range." *Commonwealth v. Rich*, 392 Pa.Super. 380, 572 A.2d 1283, 1285 (1990) (citations omitted). A claim by a defendant that the sentencing court did not adequately explain its reasons for the sentence raises a substantial question prompting our review. *See Commonwealth v. Jones*, 418 Pa.Super. 93, 613 A.2d 587, 590 (1992) (en banc), *appeal denied*, 535 Pa. 615, 629 A.2d 1377 (1993).

The transcript reveals that after careful consideration by the sentencing court on all evidence offered by both parties, which consideration is evidenced by the court's thoughtful commentary throughout the hearing, the court imposed sentence and made the following conclusions:

This sentence exceeds the sentencing guidelines because, number one, the Court considers this to be a most heinous crime committed by the defendant; secondly, the extreme emotional trauma that has been experienced on the part of

6. For instance, the thrust of two of appellant's claims is the sentencing court's alleged failure to give proper weight to evidence presented at the sentencing hearing. Specifically, appellant alleges that the court undervalued the psychologist's report and overvalued certain testimony by the victim's mother. Such allegations clearly do not raise a substantial question warranting our review. *See Commonwealth v. Frank*, 395 Pa.Super. 412, 577 A.2d 609, 622, *appeal denied*, 526 Pa. 629, 584 A.2d 312 (1990).

the victim and her family; that the Court is not convinced that the defendant will no longer be a danger to society; and, further, that the defendant has shown no remorse in respect to the incident involved in this case.

Sentencing Transcript at 198. The above-quoted excerpt not only satisfies the requirements in *Rich,* it also is fully supported by the record in this case. Appellant's sentencing challenges, therefore, are rejected.

Judgments of sentence affirmed.

WIEAND, J., files a dissenting opinion.

WIEAND, Judge, dissenting:

Steven Impellizzeri, the appellant, was tried by jury and was found guilty of numerous offenses, including rape, involuntary deviate sexual intercourse and kidnapping. During trial, the Commonwealth was permitted to introduce into evidence a sexually explicit magazine entitled "Anal Connections," which had been seized by police upon execution of a search warrant for appellant's home. Subsequently, the Commonwealth cross-examined appellant regarding his possession of other sexually explicit materials. These materials had previously been ruled inadmissible by an **in limine** determination by the trial court, but were allowed at trial on grounds that appellant had "opened the door" to such questioning. With respect to the admission into evidence of "Anal Connections," the majority concludes that the trial court's ruling was erroneous. I agree with this determination. Despite its reasoning that the magazine "was not sufficiently probative on the issue of forcible or consensual sex," however, the majority declines to grant relief. It reaches this result by labelling the error "harmless." As to the cross-examination of appellant regarding his possession of other sexually explicit materials, the majority concludes that even if appellant did not open the door to such questioning, the error in allowing the cross-examination was also "harmless." I am unable to agree with the majority's harmless error analysis. If the evidence had

been harmless, the prosecution would not have labored so mightily to introduce this prejudicial evidence.

In a search of appellant's home, police seized the magazine entitled "Anal Connections", eleven "Hustler" magazines and two pornographic videotapes. In response to a defense motion **in limine**, the trial court ruled that all such materials, except the "Anal Connections" magazine, would be inadmissible at trial. With respect to "Anal Connections," the trial court concluded that the "magazine was relevant because of the evidence of anal sex in this case. Defendant's possession of a magazine indicating an interest in anal sex makes the allegation that anal sex had occurred more probable." After it had been introduced at trial appellant attempted to explain that the magazine had been given to him by a female co-worker and that he had saved it to give to a friend. On cross-examination, the following occurred:

Q. Now, you stated that a female gave you this magazine about two years ago when you were at Frank's Nursery?

A. That's correct.

Q. And you were saving it to give to a police buddy?

A. A—A long time friend.

Q. Do you save all of your materials to give to him?

A. Yeah, as a matter of fact I do, and I don't have like a lot of materials as you put it.

Q. You don't?

A. No.

MS. PARADIS [Assistant District Attorney]: Your Honor, may I approach the bench?

THE COURT: Yes.

(Whereupon Counsel approach Side-bar)

THE COURT: Now, you want to introduce the Hustlers?

MS. PARADIS: Yes, I do.

MS. DICKSON [Defense Counsel]: Your Honor, she opened the door to what she said, all of your materials. The District Attorney is the one who brought up of the materials first. She's opened up the door, not us.

THE COURT: Well, that's true.

MS. PARADIS: Judge, I believe on direct examination he stated that he saves things to give to him, to this officer. He saves things. So, my reference to all—

MS. DICKSON: Could you keep your voice down, please?

MS. PARADIS: My reference to all of your materials easily referred to the things he saves for that police officer and—

THE COURT: Well, I'll tell you, but before I admit it, I'll let you explore the line of questioning before I decide whether you are or not at a point where I think they can be done. I'll let you explore the line of questioning.

MS. DICKSON: What does that mean, Judge?

THE COURT: Well, she can continue to ask him about it.

MS. DICKSON: Ask him what other materials he has?

THE COURT: Yes, yes.

MS. DICKSON: Your Honor, I'm gonna object to that. That's what she—

MS. PARADIS: He testified on direct examination that he saves things to give to a police officer.

MS. DICKSON: Can you keep your voice down, please?

THE COURT: Yes, that's right. That's what he's saying now. The objection's overruled.

MS. DICKSON: And you're going to allow her to ask him about other materials he's got?

THE COURT: Yes, yes, that's what he—He said so. He says he has them. He saves them for the police officer. I want to know what he saves.

Upon conclusion of the side bar conference, the prosecuting attorney was permitted to question appellant extensively regarding his possession of other sexually explicit magazines and videotapes which the trial court had previously ruled inadmissible. In its post-trial opinion, the trial court suggested that appellant had opened the door to this cross-examination by testifying "that he did not have a lot of materials."

I agree with the majority that the magazine, "Anal Connections," was erroneously admitted into evidence. In this case, there was no dispute that the victim and appellant had engaged in deviant sexual relations. The issue for the jury, however, was whether the acts were consensual (appellant's version) or accomplished by force (the victim's version). The "Anal Connections" magazine shed absolutely no light on this issue. The pictures displayed in this magazine, albeit graphic, depicted consensual sexual acts occurring between adult men and women. There was absolutely no evidence to connect this magazine or the photos therein to the issue to be decided by the jury in the instant case. The magazine, therefore, was irrelevant and highly prejudicial. Appellant's possession of a graphic pornographic magazine served no purpose other than to brand him in the eyes of the jurors as a person of poor moral character and a sexual deviant. To the extent it had any relevancy, moreover, that relevancy was greatly outweighed by its unfair prejudice.

As for the extensive cross-examination of appellant regarding his possession of other sexually explicit magazines and videotapes, I am unable to agree with the trial court that appellant opened the door to this line of inquiry. Contrary to the representation of the prosecuting attorney during the side bar conference, appellant had not testified on direct examination that he "save[d] things" to give to his friend. Appellant's testimony was limited solely to his reason for possessing "Anal Connections" and in no way implied that he was in possession of other similar items. Nevertheless, the prosecuting attorney endeavored to ask appellant whether he saved "all of [his] materials" for his friend. It seems clear that the only purpose of this question was to delve into appellant's possession of other sexually explicit materials, an area of inquiry which had already been excluded by the trial court.

The test for determining whether an error is harmless is relatively straightforward. In *Commonwealth v. Foy*, 531 Pa. 322, 612 A.2d 1349 (1992), the Pennsylvania Supreme Court said:

It is well established in this Commonwealth that an error can be harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless. *Commonwealth v. Story,* 476 Pa. 391, 406, 383 A.2d 155, 162 (1978). See also *Commonwealth v. Lewis,* 528 Pa. 440, 598 A.2d 975 (1991); and *Commonwealth v. Williams,* 524 Pa. 404, 573 A.2d 536, 538–539 (1990). The burden of establishing that the error was harmless beyond a reasonable doubt rests with the Commonwealth. *Commonwealth v. Story,* 476 Pa. at 406, n. 11, 383 A.2d at 162 n. 11.

Error is considered to be harmless where: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Williams,* 524 Pa. 404, 573 A.2d 536, 538–539 (1990), citing *Commonwealth v. Story, supra.*

*Id.* at 327, 612 A.2d at 1352. See also: *Commonwealth v. Nolen,* 535 Pa. 77, 85, 634 A.2d 192, 196 (1993). "An error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless." *Commonwealth v. Rush,* 529 Pa. 498, 503, 605 A.2d 792, 794 (1992). See also: *Commonwealth v. Crews,* 536 Pa. 508, 529–530, 640 A.2d 395, 405–406 (1994).

In *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978), the Supreme Court held that "in applying the overwhelming evidence test to determine if an error is harmless, a court may rely only on uncontradicted evidence." *Commonwealth v. Story, supra* at 417, 383 A.2d at 168. Before an error may be deemed harmless, "[t]he *uncontradicted* evidence of guilt must be so overwhelming, and the prejudicial effect of the improperly admitted evidence so *insignificant* by

comparison, that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." *Id.* (emphasis added). In so holding, the Supreme Court cautioned that:

"a conclusion that the properly admitted evidence is 'so overwhelming' and the prejudicial effect of the ... error is 'so insignificant' by comparison, that it is clear beyond a reasonable doubt that the error is harmless, is not to be arrived at lightly."

*Commonwealth v. Davis,* supra, 452 Pa. at 178–79, 305 A.2d at 720. Accordingly, we have been reluctant to find an error harmless on the basis of overwhelming evidence.

Our cases support the proposition that in deciding whether an error is harmless because there is properly admitted overwhelming evidence of guilt, the untainted evidence relied upon must be uncontradicted. This follows the test applied by Mr. Justice Rehnquist for the Court in *Schneble v. Florida,* 405 U.S. 427, 431, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972), where the improper admission of a co-defendant's confession was held harmless because the evidence supporting the prosecution's theory was "overwhelming" and "not contradicted by any other evidence in the case."

In *Commonwealth v. Henderson,* 456 Pa. 234, 317 A.2d 288 (1974), this Court, per Mr. Justice Eagen (now Chief Justice), held an error not harmless under the overwhelming evidence test because there was evidence in the case which contradicted the guilt of the defendant. In that case, we distinguished *Commonwealth v. Camm,* 443 Pa. 253, 277 A.2d 325, cert. denied, 405 U.S. 1046, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972) (holding an error harmless), because in *Camm* "there was no evidence that could have supported acquittal." 443 Pa. at 268–69, 277 A.2d at 333, quoted at 456 Pa. at 242, 317 A.2d at 293. In *Henderson,* however, "There was ... evidence to support an acquittal," and thus the untainted evidence could not be considered overwhelming.

In *Commonwealth v. Lasch,* 464 Pa. 259, 346 A.2d 547 (1975), the Commonwealth argued that the improper admission of Lasch's pre-trial statement to the police was harm-

less error, relying on the testimony of an eyewitness and a second individual to whom Lasch allegedly made an incriminating admission. Lasch did not testify at trial and offered no evidence disputing the testimony of the Commonwealth witnesses. This Court nevertheless held that the error was not harmless, reasoning that the defendant's cross-examination cast doubt upon the credibility of the two witnesses. Accord, *Commonwealth v. Davis, supra,* 452 Pa. 171, 305 A.2d 715.

In *Commonwealth v. Tucker,* 452 Pa. 584, 307 A.2d 245 (1973), the Commonwealth improperly cross-examined its own witness. The Commonwealth argued that there was overwhelming evidence of Tucker's guilt, based upon his incustody statement implicating himself in the crime. We held that, because the accuracy of this statement was disputed, the evidence of guilt was not overwhelming.

The requirement that the "overwhelming" evidence relied upon be uncontradicted follows from the principle that an error cannot be harmless if " 'honest, fair minded jurors might very well have brought in not guilty verdicts.' " *Commonwealth v. Davis,* supra, 452 Pa. at 181, 305 A.2d at 721, quoting *Chapman v. California,* supra, 386 U.S. at 18, 87 S.Ct. at 829. A jury has the duty to weigh the evidence and resolve conflicts therein. *E.g., Commonwealth v. Murray,* 460 Pa. 605, 334 A.2d 255 (1975). Unless the evidence is uncontradicted a fair minded juror may well choose to credit the defendant's, rather than the Commonwealth's evidence.

The principle is in accord with the proper function of an appellate court. An appellate court is ill equipped to resolve conflicts in the evidence or make findings of fact. See generally *Commonwealth v. Rose,* 463 Pa. 264, 344 A.2d 824 (1975); *Commonwealth v. Oates,* 448 Pa. 486, 295 A.2d 337 (1972). As former Chief Justice Traynor has written:

"The appellate court is limited to the mute record made below. Many factors may affect the probative value of testimony, such as age . . . intelligence, experience, occupation, demeanor, or temperament of the witness. A trial court or jury before whom witnesses appear is at least in

a position to take note of such factors. An appellate court has no way of doing so. It cannot know whether a witness answered some questions forthrightly but evaded others. It may find an answer convincing and truthful in written form that may have sounded unreliable at the time it was given. A wellphrased sentence in the record may have seemed rehearsed at trial. A clumsy sentence in the record may not convey the ring of truth that attended it when the witness groped his way to its articulation. What clues are there in cold print to indicate where the truth lies? What clues are there to indicate where the half-truth lies?"

R. Traynor, The Riddle of Harmless Error 20–21 (1970). Resolution of conflicts in the evidence in order to ascertain if the evidence of guilt is overwhelming would involve a usurpation of the factfinder's function.

We recognize that a guilty verdict indicates that conflicts in the evidence were resolved in favor of the Commonwealth. However, the jury may have relied on the tainted evidence, while unsure of the verity of the untainted evidence. Similarly, the corroboration provided by the tainted evidence may have led the jury to accept the untainted evidence. Unless the evidence claimed to be overwhelming is uncontradicted we cannot conclude, beyond a reasonable doubt, that a jury would have resolved the conflicts in the same manner absent the improperly admitted evidence.

*Commonwealth v. Story, supra* at 413–417, 383 A.2d at 166–168 (footnote omitted).

In the instant case, the evidence of appellant's guilt was not uncontradicted. On the contrary, it was directly contested by appellant's own testimony that the victim willingly accompanied him to his home and consensually engaged in various sexual acts with him. Thus, the key issue for the jury to decide was the credibility of appellant's version of events as opposed to the version offered by the complaining witness. The majority concludes that the version of the complaining witness, as corroborated by other witnesses, is more credible and, therefore, determines that appellant must be guilty. The

majority may be correct. I cannot say. My role, in any event, does not require me to make that determination. My role is to determine whether there was error which may have influenced the jury's verdict. My review persuades me that there was error and that the evidence erroneously received may have influenced the verdict. Because the improper evidence may have impacted on the jury's verdict, the error was not harmless but prejudicial; and to this extent, the defendant failed to receive a fair trial.

I would reverse and remand for a new trial.