**Rake v. Moultrie**

C.P. of Berks County, no. 98-6083.

*Charles M. Watkins,* for appellants.
*Paul G. Lees,* for appellee.

STALLONE, *J.,* September 29, 2005—This is an automobile negligence action which arises out of a two-vehicle "rear-end" collision. On December 2, 1997, at approximately 4:45 p.m., the appellant, Kathleen Rake, was stopped at the intersection of Route 422 and Pine Street in the Borough of Wernersville, Berks County, Pennsylvania, when the rear of her vehicle was struck by a second vehicle being driven by the appellee, Stephanie Moultrie. In her complaint, Mrs. Rake alleged that, as a result of this collision, she sustained multiple injuries to her cervical and thoracic spine, one of her teeth and to her temporomandibular joint. Her husband, appellant Mark Rake, also asserted a claim for loss of consortium. In response, Ms. Moultrie admitted that she was negligent, but contended that her negligence was not a factual cause of the injuries and losses complained of by Mr. and Mrs. Rake.

After a trial, a jury returned a verdict in favor of Ms. Moultrie, which prompted Mr. and Mrs. Rake to file a motion for post-trial relief. Following our denial of that motion, they filed a timely appeal to the Superior Court of Pennsylvania in which they are raising three issues for appellate review.

Their first is that they are entitled to judgment n.o.v. on the basis that the jury's verdict was against the weight of the evidence.[1] This requires an examination of the evidence to determine whether Mr. and Mrs. Rake are entitled to such relief.

Beginning with Mrs. Rake's claim for injuries to her cervical and thoracic spine, the evidence is that, following the collision, Mrs. Rake was able to drive her vehicle away from the scene onto a side street, at which time she informed Ms. Moultrie, as well as a police officer who subsequently arrived on the scene, that she was "fine." N.T. trial, pp. 85-86. Three days after the collision, Mrs. Rake sought medical treatment for stiffness in her neck, although she could move her neck and shoulders normally and had normal motor strength and reflexes. N.T., trial, pp. 347-48. She did not seek any further medical care or treatment until April 20, 1998, approximately four and one-half months later, when she saw her family physician, Thomas A. Stewart M.D.

At that time, Mrs. Rake complained of numbness in her upper and lower extremities and a "cracking" noise in her neck. N.T. trial, p. 372. Dr. Stewart was familiar with Mrs. Rake's history, having treated her for a pinched nerve two years earlier in 1996. N.T. trial, p. 375. Dr.

---

1. In Pennsylvania, a request for the entry of judgment n.o.v. may be granted only in a clear case where the evidence is such that no two reasonable minds could fail to agree that the verdict should have been rendered in favor of the moving party. *Janis v. AMP Inc.,* 856 A.2d 140 (Pa. Super. 2004); *Mitzelfelt v. Kamrin,* 379 Pa. Super. 121, 549 A.2d 935 (1988). Since the entry of a judgment n.o.v. is a drastic remedy, any doubts must be resolved in favor of the verdict winner. *Cauthorn v. Owens-Corning Fiberglas Corp.,* 840 A.2d 1028 (Pa. Super. 2004).

Stewart ordered a magnetic resonance imaging (MRI) scan of Mrs. Rake's cervical spine, which disclosed a congenital narrowing of her spinal column, as well as cervical cord compression and disc protrusion at C5-C6. N.T., trial, pp. 354-55. Dr. Stewart also had Mrs. Rake undergo a thoracic MRI study, which resulted in the discovery of a right side thoracic disc herniation at T9-T10 and prompted Dr. Stewart to refer Mrs. Rake to Clifford Reed M.D., who is a neurologist. N.T. trial, pp. 356-58.

Dr. Reed testified as an expert witness relative to the issue of causation of her cervical and thoracic spine injuries, as he had taken a medical history from, and conducted a complete neurological examination of, Mrs. Rake. He was of the "impression"[2] that she had sustained a cervical "whiplash" injury, but he did not opine that the December 2, 1997 collision was the cause of that injury. N.T. trial, pp. 401-402. However, he then went on to state that the December 2, 1997 collision "could have caused" her thoracic disc herniation, but again did not opine that the December 2, 1997 collision was the cause of that particular injury. N.T. trial, p. 402. Furthermore, he admitted on cross-examination that he had previously treated Mrs. Rake in 1996 for subjective complaints of pain in her thoracic spine and that there was a similarity between her prior complaints of pain in 1996 and those in 1998. N.T. trial, p. 412. Dr. Reed also stated that, ordinarily, a person suffering from disc herniation would feel pain of some type immediately, not four and a half months after the incident which caused it, as claimed by Mrs. Rake. N.T. trial, pp. 413-14.

---

2. All scripted or otherwise highlighted language in this memorandum opinion is for emphasis only.

During the defense case, the jury heard the testimony of Walter Finnegan M.D., who conducted an independent medical examination of Mrs. Rake on August 16, 1999. N.T. videotaped deposition, p. 9. After examining Mrs. Rake and reviewing her medical records, Dr. Finnegan diagnosed Mrs. Rake with cervical degenerative disc disease at C5-C6, disc herniation at T9-T10 and degeneration of other discs in her thoracic spine. N.T. videotaped deposition, pp. 9-11. In Dr. Finnegan's opinion, both her cervical and thoracic injuries were pre-existing and, therefore, were not caused by the December 2, 1997 collision. N.T. videotaped deposition, pp. 10-12. Furthermore, according to Dr. Finnegan, there was no objective evidence showing that the collision in any way "aggravated" either her cervical or thoracic injuries. N.T. videotaped deposition, pp. 76-77.

This brings us to the evidence relative to Mrs. Rake's claim for injuries to her one tooth and her temporomandibular joint. In support of these claims, she presented the testimony of her treating dentist, Scott E. Roseberry D.D.S., as well as that of Brendan F. Mulligan D.M.D., who testified as an expert witness.

Beginning with Dr. Roseberry, he testified that he discovered a fracture of Mrs. Rake's tooth number 13 on February 11, 1998, which he treated by performing a root canal and the installation of a crown. N.T. trial, pp. 278-79. As for the cause of that fracture, Dr. Roseberry said that a fracture like this "could occur" as a result of the jaw snapping shut in a motor vehicle collision, but he was not qualified to render an opinion as to whether the December 2, 1997 collision caused this fracture. N.T. trial, pp. 285-86. Dr. Roseberry also diagnosed Mrs. Rake as suffering from a temporomandibular joint injury, which

he treated by the use of various mouthpieces and, ultimately, orthodonture. However, he likewise was not able to render an opinion relative to the causation of this injury. N.T. trial, pp. 290-91.

Dr. Mulligan, who never examined Mrs. Rake and neither spoke to Dr. Roseberry nor reviewed any of Dr. Roseberry's records, arrived at a different diagnosis, opining that Mrs. Rake suffered from atypical myofascial pain syndrome.[3] N.T. trial, pp. 143-44. Although he then went on to say that atypical myofascial pain syndrome "could be caused" by a rear-end collision, he did not opine that the December 2, 1997 collision was a factual cause of this condition in Mrs. Rake. N.T. trial, pp. 144-45.

In response, Ms. Moultrie called Barry Glassman D.M.D., to present expert testimony relative to Mrs. Rake's fractured tooth and her temporomandibular joint. Dr. Glassman testified that, after reviewing Dr. Roseberry's medical records, he could find no evidence to support Dr. Roseberry's finding of a fracture to Mrs. Rake's tooth number 13 or that Mrs. Rake had sustained any temporomandibular joint injury as a result of this collision. N.T. trial, pp. 456-57, 463-64.

In Pennsylvania, it is the jury's function to determine the weight and the credibility of the evidence submitted at trial and a reviewing court may not substitute its own judgment where it finds that the verdict is supported either by the evidence or by the lack of evidence presented

---

3. "Myofascial pain syndrome" is defined at page 882 of the Gould Medical Dictionary (Blakiston, fourth edition, 1979), as unilateral facial pain aggravated by mandibular movement and associated with tenderness of the head and neck muscles and sometimes of the temporomandibular joint on the affected side.

in support of a particular claim. *Stewart v. Owens-Corning Fiberglas,* 806 A.2d 34 (Pa. Super. 2002); *Vattimo v. Eaborn Truck Service Inc.,* 777 A.2d 1163 (Pa. Super. 2001). In this case, the jury concluded that the evidence was insufficient to warrant a finding that the December 2, 1997 collision was a factual cause of the cervical and thoracic injuries, the fractured tooth and temporomandibular joint injury complained of by Mrs. Rake and, based upon the evidence, we see no reason to disturb the jury's determination. Accordingly, we did not err in refusing to grant Mr. and Mrs. Rake's request for the entry of judgment n.o.v.

Secondly, Mr. and Mrs. Rake contend that they are entitled to a new trial because this court did not permit Ali Sadegh Ph.D., who they called as an expert in the field of biomechanics, to testify that the December 2, 1997 collision was the cause of Mrs. Rake's injuries but, instead, only allowed him to testify that her injuries "could have been caused" by the December 2, 1997 collision.

In Pennsylvania, the admission or exclusion of evidence is within the sound discretion of the trial judge, whose decision will not be reversed absent an abuse of that discretion or the commission of an error of law. *Daniel v. William R. Drach Co. Inc.,* 849 A.2d 1265 (Pa. Super. 2004). In making a ruling as to whether an expert witness is qualified to provide opinion testimony on a particular issue, the reviewing court must determine whether that witness has sufficient skill, knowledge or experience, such that his opinion will in all probability aid the trier of fact in its search for the truth. *Wexler v. Hecht,* 847 A.2d 95 (Pa. Super. 2004). If the reviewing court finds that the witness does not have such skill,

knowledge or experience, it may refuse to permit such testimony. *Miller v. Brass Rail Tavern Inc.*, 541 Pa. 474, 664 A.2d 525 (1995).

In this case, Mr. and Mrs. Rake sought to elicit medical opinion testimony from Dr. Sadegh that her cervical, thoracic and temporomandibular injuries were caused by the December 2, 1997 collision. However, while Dr. Sadegh holds a Ph.D. in Mechanical Engineering, he does not have any degree, specialized training or experience in any field of medicine. N.T. trial, p. 181. He likewise never examined Mrs. Rake or reviewed any of her medical records, including her x-rays, MRI scans and thoracic MRI study. N.T. trial, pp. 199, 209-10. As a result, he certainly was not, in our judgment, qualified, either through skill, knowledge or experience, to render a medical opinion relative to the causation of Mrs. Rake's cervical, thoracic and temporomandibular injuries. Accordingly, we clearly did not err in limiting the scope of Dr. Sadegh's testimony.[4]

Finally, Mr. and Mrs. Rake are seeking a new trial on the basis that this court should not have permitted a surveillance videotape taken of Mrs. Rake to be shown to the jury. Their argument is twofold.

The first is that the videotape created a "false impression" of Mrs. Rake's physical condition, in that it appeared to show Mrs. Rake constantly standing on her feet for a long period of time. However, the record belies that assertion, as not only does it indicate that the date

---

4. A request for a new trial based upon an evidentiary ruling by the trial court should not be granted unless it is established that the ruling complained of was erroneous and that it affected the outcome of the case. *Nigra v. Walsh,* 797 A.2d 353 (Pa. Super. 2002).

and time of each scene was clearly shown at the bottom of the tape, but it also states that the jury was informed that the original videotape had been shot over the course of two separate days in 1999. N.T. trial, pp. 424-26.

Secondly, they maintain that the videotape should not have been shown to the jury because the person who actually shot it was not called as a witness to testify as to its authenticity. However, the jury did hear live testimony from Paul Dohner, the owner of the surveillance company responsible for shooting the videotape. Mr. Dohner explained the nature of the request for surveillance, what he did in response to that request and how the surveillance itself was conducted. N.T. trial, pp. 422-24. He further testified that a total of four and one-half hours of footage had been shot and condensed into approximately a 25-minute videotape. N.T. trial, p. 424. Lastly, Mr. Dohner confirmed that the scenes in the videotape had not been altered in any way and that the time clock which appeared on the lower right-hand corner of the video was accurate. N.T. trial, pp. 426, 443.

It is not necessary that the person who shoots a videotape appear in court to testify to the tape's authenticity as long as someone who is familiar with it can testify that the videotape is a fair and accurate depiction of the events sought to be shown. *Commonwealth v. Hindi,* 429 Pa. Super. 169, 178, 631 A.2d 1341, 1346 (1993), accord, *Commonwealth v. Impellizzeri,* 443 Pa. Super. 296, 308, 661 A.2d 422, 428 (1995). In this case, Mr. Dohner's testimony was more than sufficient to authenticate the videotape.[5]

---

5. We also note that Mr. and Mrs. Rake did not present any evidence to dispute the authenticity of the videotape.

As a result, we did not err in permitting this surveillance videotape to be shown to the jury.

And so, for these reasons, we affirm our denial of Mr. and Mrs. Rake's motion for post-trial relief and respectfully request the Superior Court of Pennsylvania to deny this appeal.