J-S51008-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RAFAEL JONES | |
| Appellant | No. 2249 EDA 2015 |

Appeal from the Judgment of Sentence June 3, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013365-2012

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:                    **FILED JULY 22, 2016**

Appellant, Rafael Jones, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his bench trial convictions for murder of the first degree, robbery, conspiracy, and violations of the Uniform Firearms Act ("VUFA").[1]  We affirm.

On August 18, 2012, shortly before 6:00 a.m., Officer Moses Walker ("Victim") had just finished an overnight shift at the Philadelphia police station located at 17th and Montgomery Streets and was walking to a bus stop to go home.  Appellant and his cohort, Chancier McFarland, observed Victim walking down Cecil B. Moore Avenue.  Appellant and Mr. McFarland

_____

[1] 18 Pa.C.S.A §§ 2502(a), 3701(a)(1)(i), 903, 6106, 6108, respectively.

_____

*Retired Senior Judge assigned to the Superior Court.

stopped Victim and held him at gunpoint in an effort to take his belongings. When Victim yelled and tried to escape, Appellant shot him three times. After taking some items from Victim, Appellant and Mr. McFarland fled the scene. The police received a 911 call shortly after the shooting. Paramedics arrived and rushed Victim to a nearby hospital, where he was pronounced dead. On August 22, 2012, police arrested Appellant in South Philadelphia.

On December 11, 2014, following a bench trial, the court convicted Appellant of first-degree murder, robbery, conspiracy, and VUFA. The court sentenced Appellant on June 3, 2015, to an aggregate term of life plus twenty-three and a half (23½) to forty-seven (47) years' imprisonment. Appellant filed a timely post-sentence motion on June 15, 2015, which the court denied on June 22, 2015. On July 22, 2015, Appellant filed a timely notice of appeal. On October 19, 2015, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Appellant timely complied.

Appellant raises two issues for our review:

> DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY ALLOWING INTO EVIDENCE, OVER APPELLANT'S OBJECTION, VIDEO TAPES THAT HAD NOT BEEN AUTHENTICATED?
>
> DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY DENYING APPELLANT'S MOTION FOR A NEW TRIAL AS A RESULT OF A **BRADY**[2] VIOLATION INVOLVING THE

---

[2] **Brady v. Maryland,** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

COMMONWEALTH'S FAILURE TO PROVIDE ALL THE TRIAL MATERIAL FAVORABLE TO THE DEFENSE, *I.E.*, ESSENTIAL INFORMATION REGARDING THE CRIMINAL HISTORY AND/OR INVESTIGATION OF THE KEY COMMONWEALTH WITNESS?

(Appellant's Brief at 4).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Jeffrey P. Minehart, we conclude Appellant's issues merit no relief. The trial court's opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed December 14, 2015, at 8-12) (finding: **(1)** Detective Dunlap is trained expert in field of seizing and handling digital evidence and video recordings; Detective Dunlap testified that following shooting, he examined video cameras in area and determined they were in working order; detective was familiar with area and verified that videos accurately depicted it; further, Mr. McFarland and another Commonwealth witness, who was childhood friends with Appellant, identified Appellant as individual in videos; Mr. McFarland also identified himself in videos and confirmed recordings were made around time of incident; testimony of three witnesses was sufficient to permit introduction of videos in evidence; **(2)** at sentencing, Commonwealth's attorney informed court he had been contacted by federal prosecutor following Appellant's trial; federal prosecutor told Commonwealth's attorney that Mr. McFarland had been subject of homicide investigation by Philadelphia police that occurred in

2011; police ultimately cleared Mr. McFarland as suspect and charged another individual; Commonwealth did not offer Mr. McFarland any inducement or deal to testify in instant case based on previous homicide investigation; evidence of Mr. McFarland's involvement in previous homicide investigation likely would have been excluded at trial as irrelevant; Appellant failed to establish he was prejudiced by Commonwealth's failure to provide information regarding that investigation prior to trial, especially in light of overwhelming evidence of Appellant's guilt; therefore, Appellant's **Brady** claim lacks merit).   Accordingly, we affirm on the basis of the trial court opinion.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/22/2016

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CRIMINAL TRIAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA     :     COURT OF COMMON PLEAS
    :     OF PHILADELPHIA
    :
VS.     :     CRIMINAL TRIAL DIVISION
    :
    :     CP-51-CR-0013365-2012
RAFAEL JONES     :
    :

        **FILED**

**OPINION**        **DEC 1 4 2015**

**PROCEDURAL HISTORY**        **Post Trial Unit**

The above-named defendant, Rafael Jones, was charged as of the above Bill and Term numbers with, *inter alia*, murder, generally, robbery, criminal conspiracy to commit robbery, possession of a firearm prohibited, carrying a firearm without a license, carrying a firearm on a public street, and possessing an instrument of crime, generally. These charges stem from an incident that occurred on August 18, 2012, in the area of Cecil B. Moore Avenue and Woodstock Street between 5:30 and 6:00 a.m., during which appellant and Chancier McFarland committed a robbery together of Philadelphia Police Officer Moses Walker, who had just gotten off duty and was going home. During the robbery defendant shot and killed Officer Walker.

Defendant's trial commenced on December 8, 2014, before this Court, sitting without a jury. On December 11, 2014, this Court found defendant guilty of first-degree murder, and the other charges set forth above. Sentencing was deferred until June 3, 2015, on which date this Court first denied defendant's Motion for Extraordinary Relief and then granted a motion for arrest of judgment with respect to the charged of possession of a firearm prohibited. This Court then imposed an aggregate sentence of life imprisonment plus twenty-three and one-half to forty-

1

seven years' incarceration. Following the imposition of sentence, appellant filed a post-sentence motion, which this Court denied on June 22, 2015. Defendant thereafter filed a notice of appeal and a requested Pa.R.A.P. 1925(b) Statement.

**FACTUAL HISTORY**

On August 18, 2012, shortly before 6:00 a.m., Philadelphia Police Officer Moses Walker had just finished his shift at a police station located at 17th and Montgomery Streets and was going home. After leaving the station he proceeded to Cecil B. Moore Avenue and was walking westbound thereon in civilian clothes when he was approached by appellant and Chaucier McFarland, who intended to rob the officer because they thought he was a Temple University student and that he might have a computer in the back pack he was carrying. During the encounter defendant fatally shot the officer when he started yelling and attempting to flee.

Philadelphia Police Officer Ryan Saunders was the first officer to arrive at the scene. He observed Officer Walker curled up on the ground and dragged him into his patrol car where Officer Saunders attempted to keep Officer Walker, who had been shot, awake but to no avail. After Officer Walker expired Officer Saunders observed a firearm on the ground that had fallen out of Officer Walker's shirt when Officer Saunders had lifted him off of the ground, emptied it of ammunition, and put it in his waistband. An emergency wagon arrived shortly thereafter and Officer Walker was transferred into it. Officer Walker was then driven to a nearby hospital where he was pronounced dead.

An autopsy performed on the officer's body revealed that he died as a result of having suffered three gunshot wounds that injured a lung, liver, intestines, a kidney, and his left hand. During the autopsy, a spent projectile was recovered from the victim's body. Two of the bullet wounds suffered by the victim exited his body. The manner of death was deemed to be homicide.

2

An examination of the scene resulted in the recovery of a gun magazine that belonged to the gun recovered by Saunders, two spent shell casings, and a knapsack as well as a spent projectile that was found embedded in a fence. The knapsack and firearm belonged to Officer Walker. Inside the back pack police found a .40 caliber spent projectile.

In addition to the foregoing physical evidence police recovered a .40 caliber Smith and Wesson Taurus Model handgun on March 2 2014. An examination of that weapon and the other ballistic evidence collected by police revealed that the two fired projectiles referred to above and the two spent shell casings all were .40 caliber and had been fired from the .40 caliber handgun recovered on March 2, 2014.

Following the shooting police canvassed the neighborhood and recovered several video recordings taken by security cameras. Those recordings depicted two individuals of interest, one in dark clothing and the other in light clothing, in the area at about the time Officer Walker was shot. One of the cameras also captured Officer Walker as he walked westbound on Cecil B. Moore Avenue.

Mr. Chancier McFarland was a participant in the incident with defendant and he and defendant spent the hours prior to the shooting at McFarland's house.[1] At about 5:00 a.m., on the day of the incident defendant and McFarland left McFarland's house after the two men decided to commit a robbery. After McFarland armed himself with a black .40 caliber hand gun, the two men rode around in McFarland's car scouting out possible victims who would not put up a fight. They did not see anyone and parked because the car was running out of gas.

---

[1] McFarland, who was arrested and held on charges that included second-degree murder and conspiracy cooperated with authorities and agreed to testify for the Commonwealth in exchange for a negotiated plea agreement permitting him to plead guilty to third-degree murder and other offenses, which called for the imposition of a sentence of twenty to forty years' incarceration. The plea agreement also required McFarland to testify to robbery and related charges in federal court, which he did prior to testifying in the instant matter.

3

Upon parking the car, McFarland gave defendant his gun, the .40 caliber handgun, after which they walked toward Oxford Street and then north on 19th Street toward Cecil B. Moore Avenue. When they reached 19th Street and Cecil B. Moore Avenue they observed a male, the victim herein, carrying a back pack and decided to rob him because they thought the victim might be a Temple student and might be carrying a computer. They followed the victim to 20th Street where defendant attempted to have him stop walking by asking him for a light. The victim stated that he did not smoke and continued walking westbound on Cecil B. Moore Avenue.

McFarland and defendant again began following the victim and defendant stopped him while simultaneously pulling out the gun McFarland had given him. Defendant stuck the gun in the victim's face. The victim began making noise and tried to run at which time defendant fired several shots at the victim while standing about four feet from him, at least one of which McFarland believed hit the victim his midsection. After being shot, the victim ran toward a fence and collapsed. Defendant and McFarland ran from the scene but not before McFarland snatched the victim's iPod and earphones. McFarland returned to his car and went home where he changed his clothes.

While at home, McFarland spoke to defendant and arranged to pick him up. On the way to get defendant McFarland drove by the scene and observed police and the victim there. After picking up defendant, who retrieved the murder weapon from a lot where he had hid it, the men drove to McFarland's house, where they changed their clothes and then drove to a friend's house. While at his house, McFarland put the gun back in the location he earlier had retrieved it from before the men left to rob someone. Both men then went to Maryland and Virginia where they engaged in coupon fraud.

4

The men returned later that evening and McFarland immediately travelled to Alabama after viewing newscasts that broadcast videos depicting him and McFarland. McFarland eventually decided to stop running and contacted the FBI to turn himself in, which he did shortly thereafter.[2] He then was returned to Philadelphia on August 27, 2012, where he gave authorities several statements implicating himself and defendant in the murder, which defendant later asked McFarland to recant.

McFarland identified himself, defendant, and the victim in various video recordings collected by police in the area where the shooting occurred following the shooting. He also stated that he gave the gun to his step-father so that he could dispose of the weapon.

On August 20, 2012, Mr. Maurice Gibbs came in contact with defendant, someone he knew for some time near Mr. Gibbs' home in southwest Philadelphia. Defendant took Mr. Gibbs aside and asked him had he heard anything on the news about the killing of a police officer. When Mr. Gibbs answered negatively, defendant stated, "Damn, you should have seen. That was me." After Gibbs told defendant to stop lying, defendant added, "It was. I'm serious." Defendant then told Mr. Gibbs that he was the only person in Southwest Philadelphia who knew that defendant had shot the police officer after which defendant made a telephone call using Mr. Gibbs cell phone. During the call, defendant gave the person to whom he was speaking Mr. Gibbs' address. After the call ended, defendant warned Mr. Gibbs that he had just put a "check" on him and that if anyone found out that defendant had been in the area, Mr. Gibbs and his family would be killed.

After this conversation, defendant told Mr. Gibbs that he would be staying with Mr. Gibbs and his family that night, which he did over Gibbs' objection. The next day, defendant

---

[2] Upon surrendering to the FBI, McFarland gave a statement that only inculpated defendant.

5

again admitted to Mr. Gibbs that he had shot the victim and gave Mr. Gibbs more details about the incident including where it had occurred, that he shot the victim because the victim had fled and was "reaching," that he committed the crime with someone named "Mook," and that he did not know that the victim was a police officer.

Mr. Gibbs eventually told his girlfriend about what defendant had confessed to him. She pulled up a story about the incident on her cell phone which also had a video clip depicting two individuals who authorities believed were responsible for the death of the victim herein. Upon watching the video, Mr. Gibbs recognized defendant in the video.

After he viewed the video clip, defendant and his girlfriend went outside and Mr. Gibbs silently conveyed to his girlfriend that defendant was there playing cards. Defendant again engaged Mr. Gibbs in conversation and said that he was in Southwest Philadelphia to kill someone after which he told Mr. Gibbs that he had to change his clothes and asked Mr. Gibbs if he had sneakers he could have. Mr. Gibbs said he did not but thereafter retrieved a pair of sneakers from his girlfriend's residence that defendant put on in place of the ones he was wearing. Defendant said he needed different sneakers because he was afraid that someone might recognize him from a video recording from the sneakers he wore during the shooting. Defendant then threw the sneakers he was wearing into a dumpster.

The next day, defendant came to the home of Mr. Gibbs' girlfriend at 7:00 a.m., to speak to Gibbs, who had spent the night there. Defendant told Gibbs that he spoke with someone who wanted him to leave the area and go to a "meeting." Defendant stated that he did not want to go and the two men then went down to where a neighborhood card table was situated. Subsequent thereto, police came into the neighborhood and defendant fled but was soon thereafter taken into custody.

Mr. Gibbs spoke to police on August 22, 2012, and gave them a statement wherein he related what defendant had admitted to him about the incident. Upon reviewing the statement, Mr. Gibbs recalled that defendant had told him that he believed that he had to shoot the victim or else the victim, who was armed, was going to shoot him. Mr. Gibbs also recalled that defendant stated that persons in North Philadelphia had recognized him from video recordings and that was why he was then in Southwest Philadelphia.

During the interview, Mr. Gibbs identified a photograph of defendant and defendant's brother, who Mr. Gibbs saw with defendant the day defendant first appeared in the neighborhood. Mr. Gibbs also viewed video recordings and stated that one of the men in the video looked like defendant.

A couple of hours after he was initially interviewed, Mr. Gibbs was interviewed a second time and during this interview he identified a pair of sneakers as being the ones he had given defendant.

The next day, Mr. Gibbs gave a video-taped interview to the Philadelphia District Attorney's office. Mr. Gibbs and his family were thereafter relocated from Southwest Philadelphia for safety reasons.

During the investigation police also obtained cell phone records for defendant's and McFarland's cell phones. Those records indicated numerous phone calls from one phone to the other prior to and following the robbery and shooting of the victim herein. The records also indicated, *inter alia*, that the cell phones were in the area where the incident occurred at or about the time it occurred.

Defendant was arrested on August 22, 2012. Following the arrest, police confiscated defendant's sneakers, which were identified by Mr. Gibbs as being the ones he gave defendant.

## DISCUSSION

In his first claim, defendant argues that this Court committed an abuse of discretion by permitting the Commonwealth to introduce in evidence several video recordings purportedly shot at or about the time of the incident herein that allegedly depicted defendant and McFarland in the vicinity of the site of the shooting of the victim. These recordings were made by video cameras located on buildings and business establishments in the area. Defendant complains that said videos should not have been deemed admissible in evidence because their introduction violated Pa.R.E. 901 as the Commonwealth failed: 1.) to authenticate them; 2.) to lay a proper foundation; and 3.) to present the owners or custodians of the videos. Defendant further complains that with respect to one of the videos, it should not have been admitted in evidence because its internal clock was incorrect.

"As a general rule, questions concerning the admissibility of evidence are committed to the sound discretion of the trial judge, whose rulings will not be disturbed on appeal absent an abuse of that discretion." Commonwealth v. Reed, 990 A.2d 1158, 1167 (Pa. 2010). An abuse of discretion is not merely an error in judgment but a gross misapplication of the law, manifestly unreasonable judgment, or demonstrable bias or partiality. Commonwealth v. Kubiac, 550 A.2d 219, 223 (Pa. Super. 1988).

With respect to the admission of physical evidence, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). Evidence may be sufficiently authenticated by direct proof and/or circumstantial evidence,

8

including the testimony of a witness with personal knowledge "that a matter is what it is claimed to be." Pa.R.E. 901(b). Authentication testimony may be provided by the person who took the photograph or video, or by some other witness "with sufficient knowledge to state that it fairly and accurately represents the object or place reproduced as it existed at the time" of recording. Nyce v. Muffley, 119 A.2d 530, 532 (Pa. 1956).

Instantly, Detective James Dunlap, a trained expert in the field of seizing and handling digital evidence and video recordings, testified that following the shooting police canvassed the area for video cameras resulting in the discovery of several different cameras. He examined those cameras and ascertained that they were in working order. Upon reviewing the recordings made by these cameras, he observed the victim herein walking on Cecil B. Moore Avenue at or about the time of the incident as well as two persons of interest who were observed together on Cecil B. Moore Avenue and two nearby locations at about that same time. The detective was familiar with the area and verified that the videos accurately depicted it.

This testimony was sufficient to permit the introduction of the videos. While the Commonwealth did not introduce the owners of the videos or any custodian of them, it was not required to because the detective was sufficiently familiar with the area and the recorders appeared to have accurately depicted what they recorded. In Commonwealth v. Impellizzeri, 661 A.2d 422,428 (Pa. Super. 1995), the Court stated that "it is not necessary that the maker of the videotape testify to the tape's accuracy; any witness familiar with the subject matter can testify that the tape was an accurate and fair depiction of the events sought to be shown."

In addition to the testimony provided by Detective Dunlop, both McFarland and Mr. Gibbs testified that they watched the videos and identified defendant in the video. McFarland also identified himself as well and confirmed that the recordings were made at or about the time

9

the incident occurred. Thus, no error was committed in permitting the Commonwealth to introduce the video tapes.

Accordingly, for all of the foregoing reasons, it is respectfully suggested that relief be denied with respect to this claim.

In his second claim, defendant argues that he is entitled to a new trial because the Commonwealth violated the holding Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide the defense prior to defendant's trial with information indicating that his co-defendant Chancier McFarland had been the subject of a homicide investigation, information defendant contends was available in 2011. Defendant asserts that had the defense been made aware of this information it may well have conducted a different pre-trial investigation or employed a different defense strategy.

At the sentencing hearing, the prosecutor informed the Court that following defendant's conviction, he was contacted by an assistant United States prosecutor that told him that in the course of investigating McFarland in a federal robbery case, information was received implicating McFarland and defendant's brother in a homicide that occurred on July 13, 2011. (N.T. 6/3/15, 2, 3). The information about the homicide was given to the Philadelphia Police Department's Homicide Unit and an investigation ensued that ultimately resulted in the clearing of McFarland and defendant's brother and the charging of another individual. (N.T. 6/3/15, 3-5). The prosecutor indicated that McFarland was never offered any inducement or deal with respect to that homicide in order to get him to testify as a Commonwealth witness in the instant matter. (N.T. 6/3/15, 6).

The U.S. Supreme Court has held that "suppression by the prosecution of evidence favorable to the accused ... violates due process where the evidence is material either to guilt or

10

to punishment, irrespective of the good faith or bad faith of the prosecution." Brady 373 U.S. at 87. To establish a Brady violation,

> a defendant must show that: (1) the evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence at issue is favorable to the defendant; and (3) the evidence was material, meaning that prejudice must have ensued. Strickler v. Greene, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). See Commonwealth v. Copenhefer, 553 Pa. 285, 719 A.2d 242, 259 (1998), cert. denied, 528 U.S. 830, 120 S.Ct. 86, 145 L.Ed.2d 73 (1999) (requiring reference to the record to prove a Brady violation). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). See also United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome").

McGill, 832 A.2d at 1019-1020. See also Commonwealth v. Paddy, 15 A.3d 431, 450 (Pa. 2011) ("Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.") (quoting Kyles v. Whitley, 514 U.S. 419 (1995)).

Here, defendant cannot and did not establish that the evidence in question would have been helpful to the defense or that he was prejudiced by the Commonwealth's failure to provide the defense with the information in question prior to the commencement of the trial. The fact is that while McFarland was accused of possibly having been involved in a homicide, he was cleared and thus, the information was not only irrelevant and likely would have been excluded at

trial, it also would not have resulted in a different outcome. This is especially so given the other evidence introduced in the case that overwhelming established defendant's guilt. Therefore, it is respectfully suggested that defendant's claim with respect to this issue be found lacking in merit.

In his final claim, defendant adverts to an exhibit attached to his post-sentence motion ,which was a hand-written note purportedly prepared by defendant wherein he requested that this Court set forth the jurisdictional and statutory bases supporting the Court's authority to impose sentence upon him as well as any conditions associated with the sentence, claims which defendant presented to this Court when he exercised his right of allocution. (N.T. 6/3/15, 56-58).

It is suggested that no relief is due on this claim because the judicial power of the Courts of Pennsylvania derives from the Constitution of the Commonwealth of Pennsylvania. See Pa.Const. art. V, § 1 ("The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, such other courts as may be provided by law and justices of the peace. All courts and justices of the peace and their jurisdiction shall be in this unified judicial system."). Moreover, this Court was duly elected to serve as a judge of the Court of Common Pleas of Philadelphia County, a position it held at the time of defendant's trial and which it currently retains. In addition, this Court met all of the statutory requisites to run for election. See 42 Pa.C.S. §§3101, 3131. Thus, pursuant to 42 Pa.C.S. §931, this Court has "unlimited original jurisdiction of all actions and proceedings, including all actions and proceedings heretofore cognizable by law or usage in the courts of common pleas." This Court had personal jurisdiction over defendant because he was charged by information with criminal offenses that were allegedly committed in Philadelphia County. See 42 Pa.C.S. §§5301, 8931.

12

With regard to the actual sentences imposed on defendant, various sections of the Crimes Code authorized this Court to impose the sentences it did on each of the crimes defendant was convicted of committing. Those sentences were within statutory limits and thus, imposed in conformity with the law. Consequently, based on the foregoing it is clear that there is no merit to defendant's assertions and it is respectfully suggested that he be denied relief with respect to this claim.

## CONCLUSION

For the foregoing reasons, the defendant's assertions of error should be dismissed for lack of merit and the judgment of sentence entered in this matter should be affirmed.

By the court,

DATE: 12/14/15

Honorable Jeffrey P. Minehart

13